ORAL ARGUMENTS HAVE NOT BEEN SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 14-5059

_____

FERNANDO ZEVALLOS,

Appellant

v.

BARACK H. OBAMA in his official capacity as
President of the United States, et al.

Appellee

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

**OPENING BRIEF FOR APPELLANT FERNANDO ZEVALLOS**

_____

Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
(202) 280-6370
ferrari@ferrari-legal.com

August 21, 2014                    *Counsel for Appellant*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel for Appellant in the above captioned matter submits this Certificate of Parties, Rulings and Related Cases.

### A. **Parties and Amici**

Plaintiff in the court below and Appellant before this Court is Fernando Zevallos.

Defendants in the court below and Appellees before this Court are Barack H. Obama, in his official capacity as President of the United States; Jacob J. Lew, in his official capacity as Director of the U.S. Department of the Treasury, Office of Foreign Assets Control; and the U.S. Department of the Treasury, Office of Foreign Assets Control.

### B. **Rulings under Review**

The ruling under review is the final order entered in case no. 1:13-cv-00390 by Honorable United States District Court Judge Rudolph Contreras on January 17, 2014, granting Appellees' motion to dismiss, or in the alternative, motion for summary judgment, and denying Appellant's cross motion for summary judgment. *Zevallos v. Obama et al.*, No. 13-0390 (D.D.C. January 17, 2014).

## C. **Related Cases**

This case has not previously been before this Court.  Counsel is unaware of any other related cases before any other court as defined under D.C. Circuit Rule 28(a)(1)(C).

<u>/s/ Erich C. Ferrari</u>
Erich C. Ferrari, Esq.

*Attorney for Appellant*
*Fernando Zevallos*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES …………………………………………… iii

GLOSSARY …………………………………………..……………… vii

STATEMENT OF JURISDICTION ……………………………..………… 1

STATEMENT OF ISSUES …………………………………………….…… 2

STATEMENT OF THE CASE ……………………………………………… 3

    A. Statutory Background ……………………………………….….. 3

    B. Statement of Facts ……………………………………………… 4

    C. Proceedings in the District Court ……………………………… 6

STANDARD OF REVIEW …………………………………………..…….. 8

SUMMARY OF ARGUMENT …………………………..………………… 10

ARGUMENT ……………………………………………….…………… 11

  I. OFAC's Conduct Violated the Administrative Procedure Act …....… 11

    A. Appellee's Fact Finding Procedures are Inherently Defective
      and Warrant *De Novo* Review
      ………………………………………………….......… 12

    B. Appellant's Continued Designation is not Rationally Based
      ………..……………………………………………...… 18

      1. U.S. criminal charges should not be considered as
         substantial evidence ……...………………………...… 20

      2. Unverified open source materials should not constitute
         substantial evidence ………...…………………….……...… 23

i

C.  Unlawful Procedural Error has Caused Appellant
Substantial Harm ……………………....……………..……... 29

II.    Appellees Violated Fifth Amendment Due Process …………..… 33

D.  Appellant was not Afforded a Meaningful Opportunity
to be Heard …………………………………………………... 33

1.  The lack of pre-deprivation notice violated due process
………………………………………....………..… 34

2.  Appellant was not afforded adequate post-deprivation
due process ……………………………………….… 39

3.  Appellant was directly harmed by OFAC's due
process violations ……………..…………………..… 44

E.  Appellant has Suffered Grave Unfairness …………....……… 45

CONCLUSION ……………………………….……………...……… 48

# TABLE OF AUTHORITIES

<u>Page</u>

**CASES**

*Al Haramain Islamic Found. v. U.S. Dept. of the Treasury*,
    686 F. 3d 965 (9th Cir. 2011) …………………………….….. *passim*

*Bell Atlantic Co. v. Twombly*,
    550 U.S. 544 (2007) ……………………………………………… 8, 33

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) ……………………………………….… 41

*Cabinet Mountains Wilderness v. Peterson*,
    685 F. 2d 678 (D.C. Cir. 1982) ………………………….….. 9

*Cablevision Sys. Corp. v. FCC*,
    597 F.3d 1306 (D.C. Cir. 2010) ………………..…………… 19, 23

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
    416 U.S. 663 (1974) …………………………………...… 34, 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ……………………………….………… *passim*

*Fla. Gas Transmission Co. v. FERC*,
    604 F.3d 636 (D.C. Cir. 2010) ………………………………… 19, 28

*FPL Energy Me. Hydro LLC v. FERC*,
    287 F.3d 1151 (D.C. Cir. 2002) ………………………….. 20

*Gilbert v. Homar*,
    520 U.S. 924 (1997) ……………………………….............. 44

*Global Relief Found. Inc. v. O'Neill*,
    207 F. Supp. 2d 779 (N.D. Ill. 2002) …………………………. 38

*Authorities upon which we chiefly rely are marked with asterisks.*

*Holy Land Found. For Relief and Dev. v. Ashcroft*,
219 F. Supp. 2d 57 (D.D.C. 2002) …………………….………… 9, 38

*Holy Land Found. For Relief and Dev. v. Ashcroft ("Holy Land II")*,
333 F.3d 156 (D.C. Cir. 2003) ………………...……………… 9, 39

*Islamic Am. Relief Agency v. Gonzales*,
447 F.3d 728 (D.C. Cir. 2007) ………………...………………… 8, 9

*Islamic Am. Relief Agency v. Unidentified FBI Agents*,
394 F. Supp. 2d 34 (D.D.C. 2005) …………………………….. 38

*Kadi v. Geithner*,
_ F. Supp. 2d _, No. 09-108, 2012 WL 898778 (D.D.C. Mar. 19, 2012)
……………………………………………………………..… 39

*Kindhearts for Charitable Humanitarian Dev., Inc. v. Geithner*,
647 F. Supp. 2d 857 (N.D. Ohio 2009) ………………….…….. 40, 42, 43

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ……………………………………………… 34

*McCready v. Nicholson*,
465 F.3d 1 (D.C. Cir. 2006) …………………………………… 8

*Media General, Inc. v. Tomlin*,
387 F.3d 865 (D.C. Cir. 2004) ………………...……………… 28, 47

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ………......................................................... 9, 19, 27

*\*Nat'l Org. for Women v. Social Sec. Admin.*,
736 F.2d 727 (D.C. Cir. 1984) …………………………… *passim*

*Santillan v. Gonzales*,
388 F. Supp. 2d 1065 (N.D. Cal. 2005) ……………………….. 27

*\*Stansell v. Revolutionary Armed Forces of Colombia*,
704 F. 3d 910 (11th Cir. 2013) ……………………….…….. 35, 37

iv

*Tao v. Freeh*,
    27 F.3d 635 (D.C. Cir. 1994) …………………..…………… 8, 43, 46

*Tri County Industries v. District of Columbia*,
    104 F.3d 445 (D.C. Cir. 1997) ……………………….….. 28, 47

*White Motor Co. v. United States*,
    372 U.S. 253 (1963) …………………………………..… 39

*World Fuel Corp. v. Geithner*,
    568 F. 3d 1345 (11th Cir. 2009) …………................................ 38

## CONSTITUTIONAL LAW

U.S. Const. Amend. V……………………………………………...… 6

## STATUTES

5 U.S.C. § 551 …………………………………………..……… 2, 6

5 U.S.C. § 555 …………………………………………….... 1

5 U.S.C. § 702 ………………………………………..……… 1, 2

5 U.S.C. § 706(1) ……………………………………..… 1, 2

5 U.S.C. § 706(2) ……………………………………………... 2, 9, 29

21 U.S.C. §§ 1901-1908 …………………………………...……… 1, 2, 3

21 U.S.C. § 1901 ……………………………………..…………… 27, 46

21 U.S.C. § 1902 ……………………………………..………… 3

21 U.S.C. § 1904 ……………………………………………... 4

21 U.S.C. § 1907 …………………………………………………… 21, 28, 46, 47

28 U.S.C. § 1291 ……………………………………………...….. 1

50 U.S.C. §§ 1701-1707 …………………………………………...…… 3

**REGULATIONS**

31 C.F.R. Part 501 …………………………………………...…… 2

31 C.F.R. Part 598 ……………………………………...……………. 2

31 C.F.R. § 501.802 …………………………………...……..… 30

31 C.F.R. § 501.807 ………………………………………………… *passim*

31 C.F.R. § 598.203 …………………………………………...….. 25, 32

31 C.F.R. § 598.301 …………………………………………… 20, 25

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 106-457, 1999 U.S.C.C.A.N. 304 …………………… 26

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 12(b)(1) …………………………………………… 6

Fed. R. Civ. P. 12(b)(6) ………………………………………… 6, 8, 32, 33

Fed. R. Civ. P. 56 …………………………………………….... 6, 8, 28, 47

**OTHER MATERIALS**

Merriam-Webster, 2014 (Aug. 21, 2014) …………..……………….. 25

# GLOSSARY

APA:         Administrative Procedure Act

IEEPA:       International Emergency Economic Powers Act

OFAC:        Office of Foreign Assets Control

SDN:         Specially Designated National

SFNT:        Significant Foreign Narcotics Trafficker

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA
———————————————

No. 14-5059
———————————————

FERNANDO ZEVALLOS,

Appellant

v.

BARACK H. OBAMA in his official capacity as
President of the United States, et al.

Appellee
———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
———————————————

OPENING BRIEF FOR APPELLANT FERNANDO ZEVALLOS
———————————————

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action pursuant to 21 U.S.C. §§ 1901-1908; 28 U.S.C. § 1331 (Federal Question); 5 U.S.C. §§ 702, 706(1), 551 and 555(e) of the Administrative Procedure Act.

This Court's jurisdiction over the district court's decision to dismiss the complaint on grounds of failure to state a claim upon which relief can be granted and summary judgment rests on 28 U.S.C. § 1291.

## STATUTORY PROVISIONS

The pertinent statutes, the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. §§ 1901-1908, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706(1), 551, and relevant provisions of 31 C.F.R. Parts 501 and 598, are reproduced in the addendum to this brief.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in failing to find Appellees' fact finding procedures inherently defective and apply a *de novo* standard of review to Appellant's APA claims in violation of 5 U.S.C. § 702(2)(F) of the APA.

2. Whether the continued designation of Appellant as a significant foreign narcotics trafficker under the Kingpin Act is not based on substantial evidence, and whether Appellees engaged in harmful procedural error as to the procedure used when considering Appellant's designation reconsideration request under 5 U.S.C. §§ 706(2)(A) and 706(2)(D) of the APA.

3. Whether Appellant was given a meaningful opportunity to be heard in accordance with procedural due process under the Fifth Amendment as to his designation and reconsideration as a significant foreign narcotics trafficker under the Kingpin Act.

2

4. Whether Appellant suffered a grave unfairness resulting from denial of substantive due process under the Fifth Amendment in regards to his continued designation as a significant foreign narcotics trafficker under the Kingpin Act.

## STATEMENT OF THE CASE

### A. Statutory Background

In 1999, Congress enacted the Kingpin Act. *See* Foreign Narcotics Kingpin Act, Pub. L. 106-120 (codified at 21 U.S.C. §§ 1901-08 (1999)). The purpose of the Act is "to provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States." 21 U.S.C. § 1902. The Kingpin Act is separate and distinct from the International Emergency Economic Powers Act ("IEEPA").[1] 50 U.S.C. § 1701 et seq.

A significant foreign narcotics trafficker ("SFNT") is defined as "any foreign person that plays a significant role in international narcotics trafficking, that the President has determined to be appropriate for sanctions pursuant to this chapter…." *Id.* § 1907(7). Once a person has been designated an SFNT, all such property and

---

[1] IEEPA is a separate legal authority also utilized by the Executive Branch to target parties, both foreign and domestic, for the imposition of economic sanctions.

interests in property within the United States, or within the possession or control of any United States person, which are owned or controlled by the SFNT are effectively blocked. *Id.* § 1904(b).

A person designated an SFNT may "seek administrative reconsideration of his, her or its designation…or assert that the circumstances resulting in the designation no longer apply, and thus seek to have the designation rescinded…." 31 C.F.R. § 501.807.  Administrative reconsideration is handled by the Office of Foreign Assets Control ("OFAC"), which is an agency within the Department of the Treasury. *Id.* § 501.807(b).  Additionally, the regulation states that "[a]fter the Office of Foreign Assets Control has conducted a review of the request for reconsideration, it will provide a written decision to the blocked person…." *Id.* § 501.807(d).

## B. Statement of Facts

On June 1, 2004, pursuant to the Kingpin Act, President Bush designated Appellant Fernando Zevallos as a significant foreign narcotics trafficker. Appellant's Second Amended Complaint ("Second Am. Compl.") ¶ 8.  As a consequence, all of Appellant's property within the jurisdiction of the United States was deemed blocked.

Appellant is a former lawful U.S. permanent resident currently located in Peru (Alien Registration Number A073779988). *Id.* ¶ 7.  Appellant first came to the United States in 1989 and received lawful permanent residency status in 1994. *Id.*

As a lawful permanent resident, Appellant developed, and continues to maintain, substantial connections in the United States. *Id*. He was previously married to a U.S. citizen, and has seven children, all of which are U.S. citizens. *Id*. Appellant resided in the U.S. for ten (10) years, during which time he developed and maintained companies in the U.S., held bank accounts, and purchased residential property. *Id*.

Shortly after his designation in 2004, Appellant submitted a lengthy request to OFAC contesting his designation. Second Am. Compl. ¶ 18; Administrative Record ("AR") at 14-54. The submission included three volumes of exhibits to support his arguments for delisting. *Id*. Specifically, the submission set forth various arguments, along with hundreds of pages of documentary evidence, demonstrating the unlawfulness and unwarranted disposition of Appellant as a SFNT. Despite the fact that copies of the submission and accompanying exhibits were submitted to the Office of the President, the U.S. Department of Justice, and OFAC, Appellees have apparently misplaced them. AR at 1233.

Throughout the entire reconsideration process, Appellant was met with unresponsiveness, undue delay and unjustifiable agency action. It was only with the initiation of the civil action in district court that Appellees rendered a decision to uphold Appellant's continued designation to the Specially Designated Nationals and Blocked Persons List ("SDN List").

5

### C. Proceedings in the District Court

In district court, Appellant challenged his designation on Fifth Amendment procedural and substantive due process grounds (Counts I and II), as well as the Takings Clause of the Fifth Amendment (Count III). U.S. Const. Amend. V.  Second Am. Compl. at 10-15.  Moreover, Appellant maintained that Appellees' actions over a period of eight (8) years collectively mounted to violations under the APA (Counts IV-VI). 5 U.S.C. §§ 551;706. *Id*. at 15-19.  Lastly, Appellant argued that the agency action should be reviewed *de novo* (Count VII). *Id*. at 19-20.

Appellant initially filed his complaint on March 25, 2013. Complaint, ECF 1. On March 27, 2013, Appellant filed a motion to amend the caption of the case.  Mot. to Amend, ECF 3.  The first amended complaint was filed April 2, 2013. First Am. Compl., ECF 4.

On June 14, 2013, OFAC issued its decision as to Appellant's request for reconsideration.  OFAC denied Appellant's request.  As part of its denial, OFAC included a memorandum setting forth the reasons for the denial, with citations to numerous exhibits. AR 1229-1281. The exhibits, which represent the administrative record, were furnished to undersigned counsel on June 19, 2013.  Immediately thereafter, on June 20, 2013, Appellees filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 56. First Motion to Dismiss, ECF 8.

In response to Appellees' motion, Appellant filed a Second Amended Complaint.   Second Am. Compl., ECF 10.   Appellees thereafter renewed their Motion to Dismiss. Second Motion to Dismiss ("Mot. to Dismiss"), ECF 11.

Notwithstanding Appellant's Opposition ("Opp'n", ECF 12) , on January 17, 2014, the district court granted Appellees' motion for summary judgment as to Counts I, II, and V, and motion to dismiss for Counts III, IV, VI, VII.  Memorandum Opinion ("Mem. Op."), ECF 20.

In its decision, the district court declined to apply a *de novo* standard of review as to Appellant's claims under the APA. Mem. Op. at 9 n.2.  In applying an arbitrary and capricious standard, the district court held that OFAC's decision to deny Appellant's delisting request was rationally based on substantial evidence. *Id*. at 17. The district court further held that OFAC did not commit procedural error, and even if it did, such error was harmless. *Id*. at 18-19.

As to Appellant's procedural due process claims, the court held that pre-deprivation notice was not warranted, and further, that Appellant received adequate post-deprivation due process because he was afforded a meaningful opportunity to present evidence during the reconsideration process. *Id*. at 26, 31.  Based upon its findings that no violation of the APA occurred, and that procedural due process requirements were met, the district court did not find that substantive due process had been violated. *Id*. at 33.

Appellant noticed his appeal to this Honorable Court, pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure, on March 13, 2014. Notice, ECF 21.

## STANDARD OF REVIEW

A reviewing court will apply a *de novo* standard of review to the district court's entry of summary judgment. *Islamic American Relief Agency v. Gonzales*, 447 F.3d 728, 732 (D.C. Cir. 2007). Summary judgment will be affirmed where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006). All inferences "must be viewed in a light most favorable to the non-moving party" and further, "if material facts are at issue, or though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

Similarly, the court will review *de novo* and apply the same legal standard as the lower court when determining whether to affirm a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). *Islamic Am.*, 447 F.3d at 732. To survive a motion to dismiss, the facts alleged must state a facially plausible claim for relief and the court must accept as true all material factual allegations in the complaint. *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 556 (2007).

In the context of the APA, the court shall apply a highly deferential standard when reviewing agency action, setting aside the agency's decision only if it is deemed arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Islamic Am.*, 447 F.3d at 732; 5 U.S.C. § 706(2)(A). In determining whether an APA violation has occurred, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Holy Land Found. For Relief and Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 66-67 (D.D.C. 2002) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Indeed, a court must look to whether the agency's decision was supported by a rational basis, and in doing so, may consider whether the agency has examined the relevant information and articulated a satisfactory explanation for its actions. *Id*. at 67; see also *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). If a rational connection cannot be established, the lower court's decision must be reversed. *Holy Land Found. For Relief and Dev. v. Ashcroft ("Holy Land II")*, 333 F.3d 156, 162 (D.C. Cir. 2003); see also *Motor Vehicles*, 463 U.S. at 43.

Alternatively, a court is authorized to review an agency action *de novo* "when the action is adjudicatory in nature and the agency fact finding procedures are inadequate." *Overton Park*, 401 U.S. at 415; *Cabinet Mountains Wilderness v. Peterson*, 685 F. 2d 678, 685-86 (D.C. Cir. 1982); 5 U.S.C. § 706(2)(F). *De novo*

9

review is authorized when such procedures are inadequate to the extent they are deemed severely defective. *Overton Park*, 401 U.S. at 415; *Nat'l Org. for Women v. Social Sec. Admin*., 736 F.2d 727, 745 (D.C. Cir. 1984). If the court determines that the lower court should have applied a *de novo* review of the agency's action, reversal is warranted.

## SUMMARY OF ARGUMENT

OFAC has designated Appellant as a "significant foreign narcotics trafficker" under the Kingpin Act. In conjunction thereto, the assets of Appellant within the jurisdiction of the United States have been deemed blocked and frozen. Further, Appellant's designation has served as a basis for criminal prosecutions in the United States and South America.

Appellant sought reconsideration of his designation for years without a final decision from OFAC. Despite Appellant's repeated requests for a decision on his request, it was not until a complaint was filed in the U.S. District Court for the District of Columbia that OFAC finally rendered a decision as to Appellant's delisting petition.

Appellant was not given any notice prior to designation, nor were the post-designation proceedings adequate under Fifth Amendment Due Process. Further, OFAC's decision to deny Appellant's designation reconsideration request was committed in error in that it was arbitrary and capricious and made without

observance of lawful procedure.  Lastly, OFAC's fact finding procedures in the reconsideration process are inherently deficient, to the extent that the district court should have reviewed the record under the *de novo* standard of review.  The district court erred in failing to do so.

The district court improperly dismissed the complaint for failure to state a claim on which relief can be granted and on grounds of summary judgment in favor of Appellees.  The district court made several erroneous rulings, particularly in finding that OFAC's conduct was rationally based and that Appellant has not suffered harm as a result of Appellees' conduct.

The manner in which Appellees conducted themselves in the designation and reconsideration process violated Appellant's due process rights and several provisions of the APA.  Notwithstanding the national security concerns underlying the Kingpin Act, the conduct at issue in this case is beyond what is envisioned by the applicable laws and consequently, the dismissal of the complaint in favor of Appellees was made in error and should be reversed.

## ARGUMENT

## I.   OFAC'S Conduct Violated the Administrative Procedure Act

The denial of Appellant's designation reconsideration request violated several provisions of the APA.  Specifically, OFAC's reasoning for the denial was arbitrary, capricious, and not rationally related to the underlying factual circumstances.

Further, the procedure OFAC employed during the reconsideration process, or lack thereof, reached the threshold of unlawful agency conduct. Consequently, OFAC's fact finding process is fundamentally deficient and Appellant's designation warrants *de novo* judicial review.

### A. Appellee's Fact Finding Procedures are Inherently Defective and Warrant *De Novo* Review

The district court dismissed Appellant's request for *de novo* review by concluding that "this is not an extraordinary case" that would warrant such a review based upon the standard articulated in *Overton Park*, 401 U.S. 402 (1971). Mem Op. at 9 n.2. In *Overton Park*, the Court held that in all cases involving agency action, courts should apply an arbitrary and capricious standard of review. *Id*. at 413-14. However, the Court also acknowledged that in "narrow circumstances the reviewing court is to engage in a *de novo* review of the action and set it aside if it was 'unwarranted by the facts.'" *Id*. at 414. The Court went on to identify two circumstances where *de novo* review is applicable:

> First, such de novo review is authorized when the action is adjudicatory in nature and the agency factfinding procedures are inadequate. And, there may be independent judicial factfinding when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action.

*Id*. at 415.

Appellant argued before the district court, and reiterates the same argument here, that OFAC's review of delisting petitions falls under the first scenario

described in *Overton Park*; specifically, OFAC's action is adjudicatory in nature and the agency's fact finding procedures are inadequate thereto. Although in *Overton Park* the Court failed to provide specific instances of when such circumstances could arise, other cases are instructive on the issue.

For example, in *Nat'l Org. for Women v. Social Security Admin.*, it was determined that *de novo* review was applicable when reviewing the internal procedures carried out by the Social Security Administration in the context of processing a Freedom of Information Act ("FOIA") request. 736 F.2d 727 (D.C. Cir. 1984). The case presented the issue of whether the agency's procedure regarding the review of requests *not* to release information subject to FOIA was adjudicatory and sufficient under the APA. In accordance with the analysis set forth in *Overton Park*, the court first addressed whether the agency's actions were adjudicatory in nature. *Id*. at 736 F.2d at 737. As the court explained,

> [A]djudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case . . . legislative facts do not usually concern the immediate parties but the general facts which help the tribunal decide questions of law and policy and discretion.

*Id*. at 737 n.95 (D.C. Cir. 1984).

Determining that the agency's conduct was adjudicatory in nature, the court's inquiry turned to whether its fact finding procedures were inadequate. The court affirmed the application of *de novo* review and held that the agency's internal

13

procedures were inadequate in that they did not sufficiently provide interested parties with all of the relevant facts used in its decision making process. *Id*. at 739. The court went on to say, "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Id*. Operating under the "fundamental proposition of administrative law that interested parties must have an effective chance to respond to crucial facts," the D.C. Circuit held the agency's fact finding procedures inadequate and upheld a *de novo* standard of review under the APA. *Nat'l Org. for Women*, 736 F.2d at 739.

Similar to *Nat'l Org. for Women*, the district court in the instant matter should have discerned from the information before it that OFAC's internal procedures as to the reconsideration process are severely defective.   Here, OFAC's designation process relies upon the specific conduct of persons and entities in order to designate them under various sanctions regimes.   As such, OFAC's determinations to designate such parties is more akin to an evaluation of adjudicative facts, rather than a legislative inquiry into the application of the law.

Following his initial designation in 2004, Appellant's only guidance to contest the designation was to submit arguments and evidence on his behalf in accordance with 31 C.F.R. § 501.807.  Appellant proceeded to do so on December 23, 2004,

prior to receiving any portion of the administrative record. AR at 14-54. At no time did OFAC provide Appellant with information as to the standard of review employed to review his delisting petition, nor did OFAC explain its fact finding process.

After not receiving a response to his reconsideration request, Appellant brought a suit against Appellees in late 2005; however, Appellant ultimately withdrew the suit on his own accord. *Gonzalez et al. v. Bush et. al*, No. 05-cv-02196 (D.D.C. 2005). Unbeknownst to Appellant, his initiation and withdrawal of a civil suit effectively terminated his administrative request. Appellant was never informed of this unilateral decision by OFAC, which appears not to be based on any formal regulation or law. Furthermore, the misplacement of Appellant's binders of evidentiary support that were submitted with his delisting petition in December of 2004 is equally distressing. Even after Appellant contacted OFAC in 2009 regarding his reconsideration, they failed to mention the loss of those documents and did not actually address it until OFAC's evidentiary memorandum was released in 2013, when Appellant's delisting request was denied. AR at 1233.

Perhaps the most egregious deficiency in OFAC's fact finding procedures, however, is the fact that Appellant was not provided with a copy of the updated administrative record until OFAC's decision was rendered in June 2013; thereby preventing him from being able to respond to new evidence relied upon by OFAC in its denial. Additionally, OFAC's 2013 denial is substantially based upon

15

information set forth in open source materials, without any documentary evidence to substantiate the information contained therein. It should also be noted that such materials, which primarily serve as the basis to deny Appellant's 2013 reconsideration request, were not added to the record until 2013.[2] Clearly, even if Appellant had openly requested a copy of the updated record, the information would not have been available until after OFAC obtained such evidence through Internet searches conducted from January through May of 2013. As such, Appellant never would have had a chance to respond the evidence being relied upon by OFAC to maintain his designation under the Kingpin Act.

OFAC's conduct demonstrates the severely defective nature of their internal fact finding procedures. Not only was evidence in Appellant's favor not considered, but it was lost entirely. AR at 1233. Likewise, Appellant was not afforded an opportunity to address more recent information that OFAC deemed critical to Appellant's continued designation, perhaps because OFAC did not itself obtain it until 2013 in anticipation of litigation. The fact that the overwhelming majority of

---

[2] A review of the administrative record reveals that the following open source materials were obtained in 2013, as revealed by the dates of the Internet search evidenced on the documents: 1) the accounts in Panama that were frozen; 2) the 2011 and 2012 Peruvian court activity; 3) the articles referring to Appellant's control over assets; 4) an article referencing an alleged shadow advisor of Appellant; and 5) reports of a cell phone retrieved from Appellant's prison cell and the practice of narcotics prisoners using cell phones to continue their operations. AR at 1086-89; 343-344; 470-71; 338-39; 604-07; 1176; 1179-1186; 1195-97.

the information relied upon by OFAC to maintain the designation in its 2013 denial was obtained in 2013, four years following Appellant's reconsideration request, clearly demonstrates that OFAC was not working on, or processing, his reconsideration until undersigned counsel made it a point to threaten civil suit, and/or until after the civil suit was filed.  The information is also indicative of faulty procedures, as nothing has been obtained or presented in the administrative record to support the allegations contained in the open source materials, which are heavily relied upon in OFAC's 2013 denial.

As in *Nat'l Org. of Women*, there was no feasible manner in which Appellant could have understood the criteria by which his designation was being considered, nor respond to the evidence underlying that designation.  This, coupled with the fact that OFAC's fact finding procedures rest almost entirely on open source material, which arguably it equates to uncontroverted truth, is inherently deficient.

The district court clearly acknowledges that the Supreme Court has "never clearly articulated what inadequate fact finding procedures are," and proceeds to rest its decision on the D.C. Circuit's reasoning in *Nat'l Org. for Women* that "the procedures must be severely defective before a court . . . can substitute *de novo* review for review of the agency's record." Mem. Op. at 9 n.2; 736 F.2d at 745.  Yet it seems quite apparent that this is precisely the type of case where an agency's internal procedures are highly defective.  Albeit, overly general procedures are

recited in 31 C.F.R. § 501.807; this case demonstrates that OFAC fails not only to follow its own published procedures, but that its internal procedures are wholly inadequate, haphazardly conducted, and unilaterally self-serving.  Therefore, it is only reasonable to conclude that the district court erred in failing to apply *de novo* review and its decision should be reversed and remanded accordingly.

In the event that *de novo* review is deemed not applicable in Appellant's case, the generally applicable standards of 5 U.S.C. § 706 require the reviewing court to engage in a substantial inquiry.  *Overton Park*, 401 U.S. at 415.  Regardless of the standard ultimately applied, it does not serve to shield the agency "from a thorough, probing, in-depth review." *Id*.  With this proposition in mind, the Court is respectfully urged to thoroughly review the record before it and reverse the judgment of the district court.

## B. Appellant's Continued Designation is not Rationally Based

The district court improperly found that OFAC's decision to deny Appellant's designation reconsideration request was not arbitrary and capricious, and that a rational connection was found as to the factual basis for Appellant's continued designation and the Appellees' decision to maintain the designation. Mem. Op. at 17.  Agency action will be deemed arbitrary and capricious if a court concludes that the agency has failed to provide a satisfactory explanation for its action including a

"rational connection between the facts found and the choice made." *Motor Vehicles*, 463 U.S. at 43.

OFAC's determination that Appellant is a significant narcotics trafficker is based on the following: 1) 2007 U.S. criminal charges brought against Appellant for violations of the Kingpin Act; 2) the freezing of bank accounts in Panama in Appellant's name; 3) court activity in Peru in 2011 and 2012; 4) newspaper articles alleging Appellant's control over certain assets while incarcerated; and 5) newspaper articles alleging that a cellular telephone was found in Appellant's prison cell. AR at 1268-1272; Mem. Op. at 14.  In its review, the district court erred when it determined that such evidence was substantial, and justified OFAC's decision to deny Appellant's delisting petition. Mem. Op. at 17.

In reviewing whether substantial evidence exists, a court will not review how many discrete pieces of evidence are available, but rather, will turn its inquiry on whether such evidence adequately supports the ultimate decision of the agency.  *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).  While a court "will not substitute [its] judgment for the agency's," it "will vacate an agency's decision as arbitrary and capricious if its factual determinations lack substantial evidence." *Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1310-11 (D.C. Cir. 2010) (internal citations omitted).  "The substantial evidence standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the

evidence." *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002).

### 1. U.S. criminal charges should not be considered as substantial evidence.

Taking each piece of evidence in turn discounts their significance. First, the reliance on the 2007 U.S. criminal charges brought against Appellant in the Southern District of Florida is based upon circular reasoning. The charges arose from transactions related to the sale of properties allegedly owned by Appellant and his former spouse. See *United States v. Zevallos-Gonzalez et al.*, No. 07-cr-20881 (S.D. Fla. 2007). As of June 1, 2004, the properties were considered blocked property as a consequence of Appellant's designation, thus making any dealings in such property unlawful. 31 C.F.R. § 598.301. However, Applicant contends that his initial designation on June 1, 2004, was improper and a violation of due process. If the Court determines that OFAC's initial designation was a Fifth Amendment violation, it would stand to reason that the properties were wrongfully blocked. In turn, any transactions related to the properties would not have been inherently unlawful.[3]

Further, Appellant's continued designation is premised upon the theory that he continues to engage in narcotics trafficking. As set forth in the Kingpin Act, a

---

[3]Appellant sought extradition to the United States under the U.S. and Peruvian Extradition Treaty to fight the charges, but was denied. AR at 1204, 1218. Further, the indictment in Florida represents the only U.S. charges against Appellant, and was instituted three (3) years after his designation.

significant foreign narcotics trafficker is someone who engages in "any illicit activity to, manufacture, cultivate, produce, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so." 21 U.S.C. § 1907(3).  Yet the 2007 U.S. criminal charges were not brought against Appellant for involvement in narcotics trafficking, there were for dealings in his own blocked property arising from his designation.  It stretches credulity to suggest that a party designated under the Kingpin Act can be found to engage in narcotics trafficking activities, as defined by the Act, for being charged criminally for attempting to transact in blocked property which he owns and which is only blocked due to his own designation.

Furthermore, the existence of those charges should not be the basis for a continued designation, as the prohibited conduct occurred nearly a decade ago and there is no evidence to support that he has engaged in any similar conduct in the recent past which OFAC can rely on to support his continued designation.[4]

---

[4] Appellant would like to call to the Court's attention that one of the criteria by which OFAC will reconsider a designation or a blocking is if the circumstances which lead to the original designation no longer apply. 31 C.F.R. § 501.807. As such, OFAC is required by its own regulations to consider changes in circumstances as part of their analysis as to whether a designation should be rescinded. It should follow then that OFAC should consider the reality of whether certain circumstances can be changed in carrying out the reconsideration process.

In the alternative, if Appellees seek to argue that it is not the conduct underlying the charges that are the basis of the designation, but rather the mere existence of the charges themselves, then Appellant would be confined to a situation where it would be factually impossible for him to change the circumstances underlying his designation, as he cannot defend himself against those charges due to his current incarceration in Peru and the length of his remaining prison sentence there. As a result, regardless of what actions Appellant would take to change the circumstances underlying his designation, the fact finding procedures employed by the Appellee would preclude Appellant's delisting under the Kingpin Act until such time as those charges are disposed of; this is a circumstance which is completely outside of Appellant's control and exposes the flaws inherent in OFAC's fact finding procedure.  Thus, there is no rational connection between the finding of this fact and the Appellees choice to maintain the designation, nor should this fact have been considered as substantial evidence.

Accordingly, the 2007 criminal charges pending in the United States District Court for the Southern District of Florida cannot reasonably serve as a basis for his continued designation as they fail to support the assertion that he is, or was previously, engaged in narcotics trafficking.  As such, Appellant contends that the 2007 criminal charges do not warrant consideration as substantial evidence.

22

### 2. Unverified open source materials should not constitute substantial evidence.

The references to the frozen accounts in Panama, Appellant's control over certain assets, his use of a cell phone while incarcerated, and recent court activity in Peru, all represent evidence that is without merit. AR at 1086-89, 343-344, 470-71, 338-39, 604-07, 1176, 1179-1186, 1195-97.  These assertions are based upon open source materials that OFAC included in its administrative record, and to this date, there is absolutely no indication that OFAC, or any other U.S. agency, has investigated the accuracy of these newspaper articles.  To deny Appellant's delisting petition on unsubstantiated reports alone should not be permissible, and certainly should not be deemed "substantial evidence" to support his continued designation. See *Cablevision Sys. Corp.*, 597 F.3d at 1310.

While courts have previously stated that newspaper articles and hearsay can be used to support a designation under a U.S. sanctions program, in the instant matter, OFAC did not obtain such evidence until 2013 and therefore could not, and did not, develop a more fulsome and substantiated record.  From the record, there is no evidence that they sought to gather any evidence supporting the allegations in the articles, yet they are relied upon as substantial evidence in which to uphold Appellant's continued designation under the Kingpin Act.

The allegations of control over certain assets associated with narcotics trafficking are also particularly troublesome.  OFAC, and the district court, cite to

Appellant's control over certain assets, including 42 properties and 14 vehicles in Peru, and two Panamanian bank accounts totaling eight million dollars that were frozen based on ties to Appellant. AR at 338-39, 1086-89; Mem. Op. at 15. However, the only evidence in the administrative record regarding these allegations is what is found in newspaper articles from the same source, El Comercio. Interestingly enough, the articles reference court documents and actions of Peruvian prosecutors, yet the record is devoid of any documentary evidence obtained from Peruvian or Panamanian authorities to confirm Appellant's control over the aforementioned assets.[5]    Moreover, Appellees have not indicated that such documentary evidence were used in a non-public or sealed trial of the Appellant, or that such information is classified. The failure to obtain or provide such information demonstrates OFAC's belief that there is no need to confirm the validity of allegations made by foreign media concerning the parties it targets through adequate fact finding procedures.

It also seems contradictory to deem Appellant engaged in narcotics trafficking due to any ownership or control he may assert over assets which are frozen or blocked.  Specifically, if funds are blocked and/or seized in conjunction with a

---

[5] OFAC consistently relies on unsubstantiated open source materials. To cite an example, when initially designating Appellant in 2004, open source materials cited to a police manifest where Appellant allegedly confesses to being a drug trafficker. AR at 371, 375. The administrative record does not include the actual manifest, or evidence of any attempts made to retrieve the manifest.

designation, the designated party no longer has the ability to transact in or transfer such assets. Likewise, if Appellant's continued designation is based on his interest in blocked funds, it stands to reason that he could relinquish his interest in the funds as a way of negating the basis of designation. Indeed, the regulations allow for blocked persons to submit arguments or evidence on their behalf, in addition to proposing remedial steps to negate the basis of their designation. 31 C.F.R. § 501.807(a). However, in Appellant's case, he is literally prevented from relinquishing his interests in any such blocked assets due to his incarceration and the fact that the funds are blocked and inaccessible. As such, it is factually impossible for Appellant to abandon any interest in such property, as to do so would be a transaction in the property—as his abandonment of the interest in assets would then cause a third party to obtain an interest in the property[6]—and given that the blocked nature of the property which Appellees rely on to continue Appellant's designation does not permit the assets to be transacted in.

---

[6] The regulations prohibit any transaction in blocked property. 31 C.F.R. § 598.203. Blocked property refers to "any account or property subject to held in the name of a specially designated narcotics trafficker, or in which a specially designated narcotics trafficker has an interest, and with respect to which payments, transfers, exportations, withdrawals, or other dealings may not be made or effected." 31 C.F.R. § 598.301. See also the general definition for the term transaction: "an occurrence in which goods, services, or money are passed from one person, account, etc. to another." Merriam-Webster, 2014 (Aug. 21, 2014), *available at* http://www.merriam-webster.com/dictionary/transaction.

By OFAC's logic, it is citing to Appellant's interest in blocked funds to justify his continued designation, thereby suggesting that he would have to extinguish that interest to negate the basis for designation, yet Appellant is unable to abandon the assets while they remain blocked as abandonment is in and of itself a transaction, and blocked property cannot be transacted in.  OFAC's reasoning, particularly when considering the types of remedial steps a designated person must take to negate the basis of their designation, is inherently flawed and seems to be more punitive than regulatory, and clearly an example of arbitrary and capricious agency conduct.

The final piece of evidence that is relied upon is the designation by OFAC of 26 other companies and 14 individuals with alleged connections to Appellant. AR at 1236, 1270.  It is true that the Kingpin Act also serves to target others that are associated with significant foreign narcotics traffickers, including any involvement in money laundering and managing assets of the trafficker's network.  H.R. Report No. 106-457, at 43 (Nov. 9, 1999), *as reprinted in* 1999 U.S.C.C.A.N. 304, 314.  However, the designation of Appellant's alleged network occurred over five (5) years ago and pertains to individuals and entities that are *not* Appellant.  Appellant was incarcerated at the time the designations occurred, which demonstrates a lack of control of those parties.  The administrative record also fails to establish whether Appellant ever maintained control, or currently maintains control, over these parties and their alleged nefarious activities as it is devoid of any such evidence.  Rather,

their designations appear to be based simply on the fact that the individuals are either related to Appellant or are in some way affiliated with the Peruvian airline industry. Thus, such evidence should not be taken into consideration as substantial evidence when determining whether Appellant's designation is still warranted.

From its decision, the district court seems to adopt the position that the implication of national security concerns under the Kingpin Act is reason enough to justify OFAC's decision. Mem. Op. at 21-22.  Although the Kingpin Act itself is concerned with the national security, foreign policy, and economy of the United States, it should not be used to designate individuals without adherence to the law. 21 U.S.C. § 1901(a)(4),(b).  Other cases have illustrated the point that an agency's reliance on national security does not forego the fact that agency action must be rationally based. See *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1080 (N.D. Cal. 2005) (holding that the agency's "repeated, conclusory appeals to national security concerns [does] not withstand careful scrutiny and leave[s] this court with no basis for concluding that the . . . policy rationally furthers national security interests."). Even the Supreme Court has acknowledged limits on administrative power, as articulated in *Motor Vehicles*:

> Expert discretion is the lifeblood of the administrative process, but unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.

463 U.S. at 48.

27

As found in the text of the Kingpin Act, a significant foreign narcotics trafficker is identified as "any foreign person that *plays a significant role* in international narcotics trafficking" as determined by, and publicly identified by, the President. 21 U.S.C. § 1907(7) (emphasis added). Appellant has sufficiently demonstrated that the evidence used by OFAC to justify its decision that Appellant continues to be significantly involved in narcotics trafficking is not rationally connected to what the Kingpin Act requires. Moreover, references to national security concerns should not be used as a basis to allow OFAC to proceed uninhibited in its decision making.

OFAC's evidence clearly falls short of what is required under the substantial evidence standard of the APA because it fails to support the ultimate decision of the agency. *FERC*, 604 F.3d at 645. When analyzing the documentary evidence set forth in OFAC's administrative record, even the district court plainly acknowledged that the evidence used to deny Appellant's 2013 reconsideration request is sparser than the evidence OFAC relied upon in reaching its initial designation. Mem. Op. at 14. Appellant's contentions that OFAC's internal methods are arbitrary and capricious are therefore not without merit, and in accordance with Rule 56, Appellant has demonstrated that there is a genuine dispute as to the application of the Kingpin Act and OFAC's conduct thereto in light of the standards set forth under the APA. See *Media General, Inc. v. Tomlin*, 387 F.3d 865, 869 (D.C. Cir. 2004) (holding

28

summary judgment improper where the materiality of misrepresentations or omissions under the law were susceptible to divergent inferences). Therefore, when considering all of the underlying facts and inferences in a light favorable to Appellant, the district court erred when it upheld OFAC's denial and granted summary judgment in favor of Appellees.

## C. Unlawful Procedural Error has Caused Appellant Substantial Harm

The district court erroneously decided that OFAC's reconsideration process was conducted in accordance with proper agency procedure. Mem. Op. at 18-19. Further, the district court erred when it determined that even if procedural error had in fact occurred, it was harmless. *Id*.

A court may hold unlawful and set aside agency action that is found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The procedure at issue before the Court is the designation reconsideration process as administered by OFAC. Specifically, OFAC will reconsider a designation or a blocking is if the circumstances which lead to the original designation no longer apply. 31 C.F.R. § 501.807. Further, in seeking administrative reconsideration blocked persons may submit to OFAC in writing "arguments or evidence that the person believes establishes that insufficient basis exists for designation." 31 C.F.R. § 501.807(a). Such information will be reviewed by OFAC, and subsequently

OFAC "will provide a written decision to the blocked person" and "such notice shall constitute final agency action."  31 C.F.R. §§ 501.807(b), (d); 501.802.

In accordance with the minimal guidance set forth in the regulations, Appellant submitted multiple volumes of documents in support of his designation reconsideration in 2004.  Appellant anticipated that OFAC would review the evidence provided and would fairly consider his proposition that an insufficient basis exists to support his designation.  Rather than comply with its own procedures set forth in § 501.807, OFAC misplaced the three volumes of documents submitted by Appellant. AR at 1233.  What makes OFAC's conduct even more egregious is their argument that it was somehow Appellant's duty to resubmit the evidence in 2009, when his delisting request was deemed reinstituted, but without noticing the Appellant that his 2009 submission was deemed to have been a reinstitution of the case and not a continuation of his prior reconsideration matter.

It can be inferred from OFAC's conduct that they neither felt compelled to follow their own procedural process, nor felt obliged to keep Appellant informed of significant decisions made internally by the agency.  This is evidenced by the fact that OFAC failed to notify Appellant that they had misplaced the volumes of evidence initially provided and moreover, that OFAC deemed his original delisting petition withdrawn in 2005.  Apparently, an internal decision was made by OFAC that Appellant's initial reconsideration request was considered withdrawn following

Appellant's filing and voluntary withdrawal of a civil suit in 2005, however, the Appellant was never informed of this. AR at 1235. This internal determination by OFAC as to Appellant's request caused his administrative case to sit dormant, unbeknownst to Appellant, for a period of four (4) years. Had Appellant been kept abreast of such a significant agency decision, he would have immediately reinstated his delisting request and exerted efforts during that time to assist in the reconsideration process. The arbitrary decision of OFAC, which was not based on any regulation or policy enunciated by OFAC, the regulations, or any other searchable law, was an unreasonable decision and the district court's ruling otherwise was improper. Mem Op. at 28 n.16.

The published procedures for designation reconsideration are limited at best. Nevertheless, Appellant relied on the assumption that OFAC would seriously consider any arguments he set forth, including documentary support, that his designation was unwarranted. OFAC not only failed to follow its own procedure, but rather followed internal procedures that it seems to have made up along the way. The district court's decision fails to even consider or address these arguments, and as such, its ruling was made in error.

The Appellant's continued designation as a consequence of OFAC's denial is not without harm. Appellant's property within the U.S. is blocked, he has suffered reputational harm as to his legitimate business activities, and the wrongful

designation has caused multiple investigations and prosecutions of himself and his family. To cite an example, Appellant's designation has not only inhibited access to assets to assist with his children's school or living expenses, but even assuming he was able to help them financially, they are U.S. citizens and thus prevented from receiving any type of financial aid from Appellant because such assistance is unlawful under the Kingpin Act. 31 C.F.R. § 598.203; AR at 666-668, 958-59, 1203-07. This, coupled with Appellant's ongoing legal battles in Peru, in which his U.S. designation is a factor, clearly represents the harms associated with OFAC's designation and subsequent denial. AR at 958-59, 1077, 1079-80, 1187, 1203-07, 1268.

As long as Appellant is designated as a significant foreign narcotics trafficker, he will not be able to rectify the wrongs against his reputation, his legitimate business affairs, and the constant investigations into his family affairs. Appellant contends that if OFAC would have followed proper procedure in reviewing his delisting request, for example, by actually reviewing the evidence he presented on his behalf, it arguably would have reached a different conclusion. It follows that if Appellant's designation is rescinded, the aforementioned harms would be resolved.

In accordance with the requirements to defeat a motion to dismiss under Rule 12(b)(6), the district court should have accepted Appellant's factual allegations as true and construed them in his favor; specifically, that OFAC's internal procedures

for evaluating his delisting request were made in error. *Twombly*, 550 U.S. at 556. Appellant has demonstrated that there are undeniably factual matters at issue, chiefly the lawfulness of OFAC's internal procedures for evaluating Appellant's delisting request.

The district court reasoned that such conduct, although potentially unreasonable, was not sufficient to support a claim for relief because OFAC ultimately upheld Appellant's designation and thus any errors committed were harmless. Mem. Op. at 19. However, the district court failed to recognize that Appellant was harmed by not having his evidentiary support adequately reviewed. The failure by OFAC to review the evidentiary support, and its lack of adequate fact finding procedures to substantiate its own record, resulted in the unreasonable denial of Appellant's delisting petition. Therefore, the district court erred when it dismissed Appellant's claim pursuant to Rule 12(b)(6).

## II.  Appellees Violated Fifth Amendment Due Process

### A. Appellant was not Afforded a Meaningful Opportunity to be Heard

The district court erred in holding that Appellant was not entitled to pre-deprivation notice of his 2004 designation. Mem. Op. at 26. Likewise, the court erred in holding that the post-deprivation process was adequate. *Id*. at 31. The decision also improperly determined that even if a post-deprivation due process violation did occur, the error was nonetheless harmless. *Id*. at 32.

### 1. The lack of pre-deprivation notice violated due process.

Through procedural due process, constraints are imposed on governmental decisions where individuals have been deprived of liberty or property interests within the meaning of the Due Process Clause of the Fifth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). It is uncontroverted that the "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id*. at 333. Indeed, "The right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Id*.

The Court in *Mathews* enumerated three balancing factors when determining what level of process is due:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id*. at 335. Yet, rather than analyze Appellant's due process rights under the *Mathews* factors, the district court looked to IEEPA precedent regarding pre-deprivation process under the test articulated in *Calero-Toledo v. Pearson Yacht*

*Leasing Co.*, which pertains to the seizure of property for purposes of forfeiture. 416 U.S. 663, 664 (1974); Mem. Op. at 25-26.

The *Calero-Toledo* factors consider the following: 1) whether the seizure is directly necessary to secure an important governmental or general public interest; 2) whether there is a special need for very prompt action; 3) whether the governmental body has kept strict control over its monopoly of legitimate force, taking into account whether the seizure was necessary and justified in the particular instance. *Id.* at 678. Applying *Calero-Toledo* to Appellant's designation and blocking of property, the district court held that the governmental interest in national security, mainly the special need for prompt action, outweighed Appellant's interest in his assets, and therefore pre-deprivation notice was not required. Mem. Op. at 26.

While *Calero-Toledo* has been relied upon in decisions pertaining to the blocking of assets under IEEPA, it does not warrant automatic application to a designation, or the blocking of property, pursuant to the Kingpin Act. The Kingpin Act is a separate designating authority which carries with it different underlying policies and application from IEEPA. The distinction between the two bodies of law is appropriately addressed in *Stansell v. Revolutionary Armed Forces of Colombia*, 704 F. 3d 910 (11th Cir. 2013).

In *Stansell*, the plaintiff-appellees were awarded $318 million in compensatory damages against the Revolutionary Armed Forces of Colombia

(FARC) for terrorist acts. *Id*. at 913.  The action was brought against FARC under the civil remedy provisions of the Anti-Terrorism Act, 18 U.S.C. § 2333. *Id*. at 913. The Anti-Terrorism Act permits parties awarded a judgment against a terrorist party to seek garnishment from blocked assets. *Id*.

FARC was designated by OFAC under both IEEPA and the Kingpin Act, thus its blocked assets were subject to the provisions of the Anti-Terrorism Act based upon its IEEPA designation as a "global terrorist." *Id*. at 912.  Because plaintiff-appellees were unable to collect the judgment from FARC itself, they pursued a writ of garnishment from Mercurio International, an entity designated under the Kingpin Act for its alleged ties to FARC. *Id*. at 913.  Appellees main argument focused on the definition of "blocked asset" under the Terrorism Act.  *Id*. at 915.  Because the Terrorism Act specifically defined "blocked asset" to mean assets blocked pursuant to IEEPA, and the text clearly failed to include assets blocked pursuant to the Kingpin Act, the court held such an interpretation was improper. *Id*. at 915.

Alternatively, appellees argued that a designation under the Kingpin Act was inherently the same as IEEPA, and as such, they were entitled to collect damages from Mercurio. *Id*. at 916.  Appellees relied upon the theory that the designation criteria under IEEPA and the Kingpin Act are similar in some regards, specifically that entities designated under the Kingpin Act would also satisfy the criteria for designation under IEEPA. *Id*.  Disagreeing with the proposition that designation

36

criteria under the two is the effectively the same, the Eleventh Circuit held, "Similarities between laws, however, do not make them the same law. The Kingpin Act is not the Economic Powers Act," and thus, "the Kingpin Act cannot be treated as though it were the Economic Powers Act." *Id*. at 917. The court's holding pertains directly to the assertion that designations under the two statutes are not to be considered one in the same.

Contrary to the Eleventh Circuit's decision, the district court improperly likened the two statutes in its analysis of the level of due process required prior to a designation under the Kingpin Act. The district court limited the *Stansell* decision to the interpretation of the term "blocked asset" under the Anti-Terrorism Act and determined that *Stansell* was inapplicable to Appellant's argument. Mem. Op. at 23 n.13. In doing so, it failed to recognize that the Eleventh Circuit was addressing an inherently flawed argument that is raised when comparing IEEPA and the Kingpin Act; that the legal application of both statutes, *particularly in regards to designations*, should be the same. In its decision, the Eleventh Circuit clearly brings to light the fact that designations under IEEPA and the Kingpin Act are distinct and separate, and should ultimately be treated as such. The district court thus erred when it failed to consider the reasoning in *Stansell*, and defaulted to a due process analysis under IEEPA precedent.

Likewise, in *World Fuel v. Geithner*, the Eleventh Circuit was once again faced with addressing the differences between IEEPA and the Kingpin Act. 568 F.3d 1345 (11th Cir. 2009).  In *World Fuel*, the court acknowledged that OFAC's conduct was arbitrary and capricious where it employed the same process for reviewing a license application to unblock funds under IEEPA to assets blocked pursuant to the Kingpin Act. *Id*. at 1349.  Although considered in a separate context, the court's reasoning that IEEPA is a "statute with an entirely distinct target, purpose, and legislative history from the Kingpin Act," is not to be completely disregarded. *Id*.

The IEEPA cases relied upon by the district court in determining the level of due process to be afforded to the Appellant prior to his designation under the Kingpin Act are distinguishable from the case at hand.[7]  While IEEPA may be relevant in considering the legislative background of the Kingpin Act, the two statutes are an entirely different pieces of law and warrant consideration separate and independent of one another.  Further, pre-deprivation due process requirements under the Kingpin Act have yet to be considered in the D.C. Circuit; thus, it stands to reason that summary judgment as a matter of law was improper where there is no legal precedent

---

[7] The cases cited to by the district court pertain strictly to IEEPA. See Mem. Op. at 25, citing *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 49-50 (D.D.C. 2005) (blocking of property following a designation as a specially designated global terrorist); *Holy Land*, 219 F. Supp. 2d at 76 (assets blocked pursuant to IEEPA terrorist sanctions); *Global Relief Found. Inc. v. O'Neill*, 207 F. Supp. 2d 779, 803 (N.D. Ill. 2002) (designation and blocking of property of alleged supporter of terrorism under IEEPA authority).

to rely upon. See *White Motor Co. v. United States*, 372 U.S. 253, 259-261 (1963) (holding summary judgment improper when presented with a case involving novel, complex issues). Consequently, due to the lack of precedent in this Circuit regarding the pre-deprivation due process analysis under the Kingpin Act, summary judgment was inherently improper. *Id*. at 261 (where the record is devoid of sufficient facts, "the applicable rule of law should be designed after a trial.").

### 2. Appellant was not afforded adequate post-deprivation due process.

Without appreciation for the consequences of a designation and blocking of property, OFAC failed to provide adequate post-deprivation due process to Appellant. Taking into consideration OFAC's critical missteps during the reconsideration process in Appellant's case, summary judgment by the district court was improper and warrants reversal.

Notice and a meaningful opportunity to be heard are the substantive requirements of post-deprivation due process. *Holy Land II*, 333 F.3d at 163; *Kadi v. Geithner*, _ F. Supp. 2d _, No. 09-108, 2012 WL 898778 at *24 (D.D.C. Mar. 19, 2012). Designated parties must be afforded, at the very least, the unclassified administrative record and be permitted to respond in writing to rebut such evidence or negate the proposition that a designation is warranted. *Holy Land II*, 333 F.3d at 164; see also *Nat'l. Org. of Women*, 736 F.2d at 739 (acknowledging that "where governmental action seriously injures an individual, and the reasonableness of the

action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue . . . at a meaningful time and in a meaningful manner."); *Kindhearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 905 (N.D. Ohio 2009).

As identified *infra*, the regulations for designation reconsideration are set forth at 31 C.F.R. § 501.807. In accordance with this regulation, Appellant contested his designation in 2004 by submitting a 32-page memorandum, accompanied by three volumes of exhibits. Due to OFAC's failure to inform him of such, Appellant was unaware that OFAC deemed his reconsideration request withdrawn upon the filing and withdrawal of his civil suit in 2005. Appellant was neither notified of this unstated internal decision by OFAC, nor does any regulation or published policy indicate that such a consequence would result. Therefore, when Appellant contacted OFAC again in 2009, he was unaware that OFAC considered it to be a renewed request, separate and apart from his 2004 request for reconsideration. AR at 1203-1207.

Further, in 2009 OFAC failed to notify the Appellant that it had misplaced the binders of exhibits he had submitted with his 2004 request for reconsideration. OFAC made no indication that it did not have the documents, nor did they request another copy. In fact, the first time Appellant was made aware that the binders could

not be found was in OFAC's evidentiary memorandum, released with the administrative record in 2013, which followed the filing of the instant suit. AR at 1233.  Contrary to the district court's findings, it is hard to believe that OFAC was able to fully and fairly evaluate the evidence presented by Appellant in his reconsideration request without having access to the hundreds of pages of evidentiary support submitted by the Appellant. Mem. Op. at 28-29.  Thus, OFAC's assertions that it considered Appellant's evidence to negate the basis for his designation can only be valued to the extent of the information OFAC had before it.

Due process prohibits "an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation," *Al Haramain Islamic Found. v. U.S. Dept. of the Treasury*, 686 F. 3d 965, 966 (9th Cir. 2011) (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*., 419 U.S. 281, 288 n. 4 (1974)).  Despite this standard, OFAC did not review Appellant's evidence in favor and further, gathered evidence against him to justify his reconsideration denial without informing him of such.  Appellant did not, and could not, have addressed the more recent documents used as evidence against him because OFAC failed to provide him with such information, or even provide notice of the existence of such information.[8]  As a direct result of OFAC's conduct, Appellant was effectively foreclosed from the

---

[8] See also *infra* pg. 16 n.2, where it is noted that OFAC did not obtain a substantial portion of the new evidence until 2013.

opportunity to present evidence contrary to OFAC's allegations, thus violating due process.

What is most disturbing, however, is OFAC's silence during the entire reconsideration process.  The district court, while acknowledging that OFAC's dilatory response was indeed alarming, nonetheless failed to hold OFAC accountable for its conduct. Mem. Op. at 30.  Even considering *Kindhearts* and *Al Haramain*, where the court actually found due process violations under exceptionally similar circumstances, the district court determined that OFAC's failure to respond was nevertheless distinguishable. See *Kindhearts*, 647 F. Supp.2d at 903-04; *Al Haramain*, 686 F.3d at 985-86.  Notably, if one were to accept OFAC's proposition that it deemed Appellant's 2009 inquiry as a reinstatement of his reconsideration request, in accordance with case law on the issue, OFAC should have communicated with Appellant and provided new evidence contained in the administrative record in order for Appellant to adequately respond to it.  Indeed, between 2005 and OFAC's 2013 decision, Appellant had not received any materials whatsoever which were being relied upon by the agency to support his designation.

The district court asserts that Appellant's receipt of evidence from the administrative record in 2005, and his receipt and responses to OFAC's questionnaire in 2009, were sufficient to distinguish the instant case from *Kindhearts* and *Al Haramain*. Mem. Op. at 30-31.  However, the district court failed to recognize

that except for the 2007 U.S. criminal charges, all of the evidence relied upon to justify Appellant's continued designation was obtained subsequent to 2009, after the questionnaire was issued and responded to. Thus, it is axiomatic that just as in *Kindhearts* and *Al Haramain*, Appellant was uninformed as to the reasons for his continued designation, resulting in a violation of his post-deprivation due process rights.

Lastly, and as acknowledged by the district court, procedural due process requirements under the Kingpin Act have not yet been addressed by this Circuit. Mem. Op. at 21. Thus, Appellant's claim was inappropriately decided on grounds of summary judgment and should have proceeded to its merits in order to address the underlying issues which have yet to be fully litigated in this Circuit. The designation and blocking of assets pursuant to the Kingpin Act, and the due process rights associated thereto, is indeed a matter of first impression for the Court. Therefore, the application of the law as to Appellant is unprecedented and when considering all inferences in favor of Appellant, summary judgment was made in error. *Tao*, 27 F.3d at 638 (holding that "if material facts are at issue, or though undisputed, are susceptible to divergent inferences, summary judgment is not available.").

### 3.  Appellant was directly harmed by OFAC's due process violations.

What was not properly addressed in the lower court is the harm that Appellant has suffered due to the inadequate due process in this case.  Without receiving pre-deprivation notice, Appellant has been forced to respond in a post hoc manner.  Moreover, the overall treatment of Appellant's reconsideration by OFAC has largely left Appellant attempting to decipher the administrative process by trial and error, only to be notified of such errors after the fact.  Such conduct has resulted in the failure of the administration of adequate due process.

As particularly relevant here, "Due process is flexible and calls for such procedural protections as the particular situation demands."  *Gilbert v. Homar*, 520 U.S. 924, 930 (1997).  Indeed, there are "strong interests on both sides of the scale," and while balancing a private party's significant interest against the government's interest in national security can be arduous, "the Constitution does require that the government take reasonable measures to ensure basic fairness to the private party and that the government follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests." *Al Haramain*, 686 F.3d at 980.

Due to the significant implications of a designation under the Kingpin Act, coupled with the significant deprivation of property, the law requires that adequate due process be met. *Id*.  Indeed, while the procedures in the context of the Kingpin

Act and its administration may require more flexibility, it should not translate to an abandonment of procedural protections. Here, OFAC failed to inform Appellant of the non-classified evidence against him, and more importantly, failed to properly consider the evidence Appellant submitted on his own behalf. In doing so, OFAC upheld his designation and consequently, Appellant contends that the errors committed by OFAC were not harmless.

## B. Appellant has Suffered Grave Unfairness

The district court improperly held that Appellant has not suffered a "grave unfairness" through his designation as a significant foreign narcotics trafficker. Mem. Op. at 33. In finding that Appellant's substantive due process rights were not infringed upon, the district court improperly relied upon its determination that OFAC's decision to deny Appellant's reconsideration request was not arbitrary and capricious, and that Appellant's procedural due process rights were not violated. *Id.*

Substantive due process requires a showing of "grave unfairness," and applies to actions that are "genuinely drastic." *Tri County Industries v. District of Columbia*, 104 F.3d 445, 459 (D.C. Cir. 1997). To address the question of whether Appellant was subjected to a grave unfairness, the Court should analyze whether Appellees deliberately flouted the law, thus resulting in a "trammel of significant personal or property rights." *Id.*

The Kingpin Act defines a "significant foreign narcotics trafficker" as "any foreign person that plays a significant role in international narcotics trafficking" as determined by, and publicly identified by, the President.  21 U.S.C. § 1907(7).  A significant foreign narcotics trafficker must also threaten the national security, foreign policy, and economy of the United States. 21 U.S.C. §§ 1901(a)(4) and (b). Further, the term "narcotics trafficking" is defined to include "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so." 21 U.S.C. § 1907(7).

Without even reviewing the substantive definitions and application of the Kingpin Act, and how it applies to Appellant, the district court granted summary judgment in favor of Appellees. Mem. Op. at 33.  The district court reasoned that based on its rejection of Appellant's APA and procedural due process claims, the substantive due process claim must likewise fail. *Id*. Indeed, rather than analyzing the underlying argument that was asserted by Appellant in its opposition motion, the lower court assumed that a grave injustice could only be met if violations of the APA claims occurred. *Id*.

The district court's decision seemingly failed to recognize that all inferences must be viewed in a light most favorable to Appellant.  *Tao*, 27 F.3d at 638.  As Appellant argued in his opposition motion, the designation as a significant foreign

narcotics trafficker does not comport with what the statute intended. It can be reasonably inferred that because Appellant is currently incarcerated in a Peruvian jail cell, he cannot possibly be involved in any significant illicit activity to traffic narcotics, and therefore does not meet the legal definition of a "significant foreign narcotics trafficker." 21 U.S.C. § 1907(7). Due to the clear lack of precedent as to the application of the definitions of the Kingpin Act, and whether such definitions apply to Appellant, there is arguably a material fact that is at issue. See *Tomlin*, 387 F.3d at 869 (holding that mixed questions of law and fact are particularly well suited for a jury to decide); Fed. R. Civ. P. 56(a).

Finally, the district court also unreasonably held that Appellant's continued designation could not possibly be determined a "trammel of significant personal and property rights," and thus he has not suffered a "grave injustice." Mem. Op. at 33. As addressed *infra*, Appellant's designation has resulted in significant harm insofar as it has had direct effects on his person and property. See *Al Haramain*, 686 F.3d at 980 (discussing the serious interests of a designated private party, given the ultimate effects of such a designation by OFAC and its "indefinite" nature). Thus, it was error for the district court to grant summary judgment of Appellant's substantive due process claims in favor of Appellees without permitting such pivotal issues to proceed on their merits.

## CONCLUSION

For the reasons described above, the decision of the district court should be reversed and remanded with instructions to the district court to apply *de novo* review to Appellant's APA claims.

Alternatively, in the event the Court finds *de novo* review improper, Appellant respectfully requests that the Court find that Appellees' decision was not based on substantial evidence, and that Appellees committed harmful procedural error, and reverse the decision of the district court as to Appellant's APA claims.

Appellant also respectfully requests the Court to hold that Appellant's procedural and substantive due process rights were violated, and reverse the decision of the district court granting summary judgment in favor of Appellees as to Appellant's Fifth Amendment due process claims.

/s/ Erich C. Ferrari
Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Telephone: (202) 280-6370
Fax: (877) 448-4885
Ferrari@ferrariassociatespc.com


*Attorney for Appellant*,
Fernando Zevallos

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32(a), I hereby certify that this Opening Brief for Appellants complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the Brief contains 11,259 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in Times New Roman 14-point font, using Microsoft Word 2013.

/s/ Erich C. Ferrari
Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Telephone: (202) 280-6370
Fax: (877) 448-4885
Email:
Ferrari@ferrariassociatespc.com

*Attorney for Appellant*
*Fernando Zevallos*

Dated: August 21, 2014

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Appellant's Opening Brief was served to all parties on the 21st day of August, 2014, via the ECF system.


/s/ Erich C. Ferrari
Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Telephone: (202) 280-6370
Fax: (877) 448-4885
Ferrari@ferrariassociatespc.com


*Attorney for Appellant*,
Fernando Zevallos

**ADDENDUM**

# PERTINENT STATUTES AND REGULATIONS

<u>Page</u>

**STATUTES**

21 U.S.C. §§ 1901-1908 …………………………………………....…..... ADD 1

5 U.S.C. § 551 …………………………………………………... ADD 8

5 U.S.C. § 706 …………………………………………………... ADD 10

**REGULATIONS**

31 C.F.R. § 501.807 …………………………………………….... ADD 12

31 C.F.R. § 598.203 ……………………..…………………………… ADD 14

fies the best practices in reducing the use of illicit drugs by chronic hard-drug users, including the best practices identified through the activities funded under this section.

**(2) Final report**

Not later than June 1, 2010, the Director shall submit to Congress a report on the demonstration programs funded under this section, including on the matters specified in paragraph (1).

**(e) Authorization of appropriations**

There is authorized to be appropriated to carry out this section $4,900,000 for each of fiscal years 2007 through 2009.

(Pub. L. 105–277, div. C, title VII, §716, as added Pub. L. 109–469, title XI, §1119, Dec. 29, 2006, 120 Stat. 3547.)

REPEAL OF SECTION

*For repeal of section on Sept. 30, 2010, see section 1712 of this title.*

## CHAPTER 23—NATIONAL YOUTH ANTI-DRUG MEDIA CAMPAIGN

### §§ 1801 to 1804. Repealed. Pub. L. 109–469, title V, §501(b), Dec. 29, 2006, 120 Stat. 3533

Section 1801, Pub. L. 105–277, div. D, title I, §102, Oct. 21, 1998, 112 Stat. 2681–752, related to requirement to conduct national media campaign.

Section 1802, Pub. L. 105–277, div. D, title I, §103, Oct. 21, 1998, 112 Stat. 2681–752, related to use of funds.

Section 1803, Pub. L. 105–277, div. D, title I, §104, Oct. 21, 1998, 112 Stat. 2681–753, related to reports to Congress.

Section 1804, Pub. L. 105–277, div. D, title I, §105, Oct. 21, 1998, 112 Stat. 2681–753, related to authorization of appropriations.

SHORT TITLE

Pub. L. 105–277, div. D, §1(a), Oct. 21, 1998, 112 Stat. 2681–751, provided that: "This division [enacting this chapter and section 7144 of Title 20, Education, and enacting provisions set out as notes under this section, section 1703 of this title, section 6301 of Title 20, and section 3751 of Title 42, The Public Health and Welfare] may be cited as the 'Drug Demand Reduction Act'."

Pub. L. 105–277, div. D, title I, §101, Oct. 21, 1998, 112 Stat. 2681–752, which provided that subtitle A (§§ 101–105) of title I of div. D of Pub. L. 105–277, enacting this chapter, was to be cited as the "Drug-Free Media Campaign Act of 1998", was repealed by Pub. L. 109–469, title V, §501(b), Dec. 29, 2006, 120 Stat. 3533.

## CHAPTER 24—INTERNATIONAL NARCOTICS TRAFFICKING

Sec.
1901.  Findings and policy.
1902.  Purpose.
1903.  Public identification of significant foreign narcotics traffickers and required reports.
1904.  Blocking assets and prohibiting transactions.
1905.  Authorities.
1906.  Enforcement.
1907.  Definitions.
1908.  Judicial Review Commission on Foreign Asset Control.

### § 1901. Findings and policy

**(a) Findings**

Congress makes the following findings:

(1) Presidential Decision Directive 42, issued on October 21, 1995, ordered agencies of the executive branch of the United States Government to, inter alia, increase the priority and resources devoted to the direct and immediate threat international crime presents to national security, work more closely with other governments to develop a global response to this threat, and use aggressively and creatively all legal means available to combat international crime.

(2) Executive Order No. 12978 of October 21, 1995, provides for the use of the authorities in the International Emergency Economic Powers Act (IEEPA) (50 U.S.C. 1701 et seq.) to target and apply sanctions to four international narcotics traffickers and their organizations that operate from Colombia.

(3) IEEPA was successfully applied to international narcotics traffickers in Colombia and based on that successful case study, Congress believes similar authorities should be applied worldwide.

(4) There is a national emergency resulting from the activities of international narcotics traffickers and their organizations that threatens the national security, foreign policy, and economy of the United States.

**(b) Policy**

It shall be the policy of the United States to apply economic and other financial sanctions to significant foreign narcotics traffickers and their organizations worldwide to protect the national security, foreign policy, and economy of the United States from the threat described in subsection (a)(4) of this section.

(Pub. L. 106–120, title VIII, §802, Dec. 3, 1999, 113 Stat. 1626.)

REFERENCES IN TEXT

Executive Order No. 12978, referred to in subsec. (a)(2), is Ex. Ord. No. 12978, Oct. 21, 1995, 60 F.R. 54579, which is listed in a table under section 1701 of Title 50, War and National Defense.

The International Emergency Economic Powers Act, referred to in subsec. (a)(2), is title II of Pub. L. 95–223, Dec. 28, 1977, 91 Stat. 1626, as amended, which is classified generally to chapter 35 (§1701 et seq.) of Title 50, War and National Defense. For complete classification of this Act to the Code, see Short Title note set out under section 1701 of Title 50 and Tables.

EFFECTIVE DATE

Pub. L. 106–120, title VIII, §811, Dec. 3, 1999, 113 Stat. 1636, provided that: "This title [see Short Title note set out below] shall take effect on the date of the enactment of this Act [Dec. 3, 1999]."

SHORT TITLE

Pub. L. 106–120, title VIII, §801, Dec. 3, 1999, 113 Stat. 1626, provided that: "This title [enacting this chapter and amending section 1182 of Title 8, Aliens and Nationality] may be cited as the 'Foreign Narcotics Kingpin Designation Act'."

### § 1902. Purpose

The purpose of this chapter is to provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States.

(Pub. L. 106–120, title VIII, §803, Dec. 3, 1999, 113 Stat. 1626.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this title", meaning title VIII of Pub. L. 106–120, Dec. 3, 1999, 113 Stat. 1626, which is classified generally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1901 of this title and Tables.

## § 1903. Public identification of significant foreign narcotics traffickers and required reports

**(a) Provision of information to the President**

The Secretary of the Treasury, the Attorney General, the Secretary of Defense, the Secretary of State, and the Director of Central Intelligence shall consult among themselves and provide the appropriate and necessary information to enable the President to submit the report under subsection (b) of this section. This information shall also be provided to the Director of the Office of National Drug Control Policy.

**(b) Public identification and sanctioning of significant foreign narcotics traffickers**

Not later than June 1, 2000, and not later than June 1 of each year thereafter, the President shall submit a report to the Permanent Select Committee on Intelligence, and the Committees on the Judiciary, International Relations, Armed Services, and Ways and Means of the House of Representatives; and to the Select Committee on Intelligence, and the Committees on the Judiciary, Foreign Relations, Armed Services, and Finance of the Senate—

(1) identifying publicly the foreign persons that the President determines are appropriate for sanctions pursuant to this chapter; and

(2) detailing publicly the President's intent to impose sanctions upon these significant foreign narcotics traffickers pursuant to this chapter.

The report required in this subsection shall not include information on persons upon which United States sanctions imposed under this chapter, or otherwise on account of narcotics trafficking, are already in effect.

**(c) Unclassified report required**

The report required by subsection (b) of this section shall be submitted in unclassified form and made available to the public.

**(d) Classified report**

(1) Not later than July 1, 2000, and not later than July 1 of each year thereafter, the President shall provide the Permanent Select Committee on Intelligence of the House of Representatives and the Select Committee on Intelligence of the Senate with a report in classified form describing in detail the status of the sanctions imposed under this chapter, including the personnel and resources directed towards the imposition of such sanctions during the preceding fiscal year, and providing background information with respect to newly-identified significant foreign narcotics traffickers and their activities.

(2) Such classified report shall describe actions the President intends to undertake or has undertaken with respect to such significant foreign narcotics traffickers.

(3) The report required under this subsection is in addition to the President's obligations to keep the intelligence committees of Congress fully and currently informed pursuant to the provisions of the National Security Act of 1947.

**(e) Exclusion of certain information**

**(1) Intelligence**

Notwithstanding any other provision of this section, the reports described in subsections (b) and (d) of this section shall not disclose the identity of any person, if the Director of Central Intelligence determines that such disclosure could compromise an intelligence operation, activity, source, or method of the United States.

**(2) Law enforcement**

Notwithstanding any other provision of this section, the reports described in subsections (b) and (d) of this section shall not disclose the name of any person if the Attorney General, in coordination as appropriate with the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, and the Secretary of the Treasury, determines that such disclosure could reasonably be expected to—

(A) compromise the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution that furnished information on a confidential basis;

(B) jeopardize the integrity or success of an ongoing criminal investigation or prosecution;

(C) endanger the life or physical safety of any person; or

(D) cause substantial harm to physical property.

**(f) Notification required**

(1) Whenever either the Director of Central Intelligence or the Attorney General makes a determination under subsection (e) of this section, the Director of Central Intelligence or the Attorney General shall notify the Permanent Select Committee on Intelligence of the House of Representatives and the Select Committee on Intelligence of the Senate, and explain the reasons for such determination.

(2) The notification required under this subsection shall be submitted to the Permanent Select Committee on Intelligence of the House of Representatives and the Select Committee on Intelligence of the Senate not later than July 1, 2000, and on an annual basis thereafter.

**(g) Determinations not to apply sanctions**

(1) The President may waive the application to a significant foreign narcotics trafficker of any sanction authorized by this chapter if the President determines that the application of sanctions under this chapter would significantly harm the national security of the United States.

(2) When the President determines not to apply sanctions that are authorized by this chapter to any significant foreign narcotics trafficker, the President shall notify the Permanent Select Committee on Intelligence, and the Committees on the Judiciary, International Relations, Armed Services, and Ways and Means of

the House of Representatives, and the Select Committee on Intelligence, and the Committees on the Judiciary, Foreign Relations, Armed Services, and Finance of the Senate not later than 21 days after making such determination.

**(h) Changes in determinations to impose sanctions**

**(1) Additional determinations**

(A) If at any time after the report required under subsection (b) of this section the President finds that a foreign person is a significant foreign narcotics trafficker and such foreign person has not been publicly identified in a report required under subsection (b) of this section, the President shall submit an additional public report containing the information described in subsection (b) of this section with respect to such foreign person to the Permanent Select Committee on Intelligence, and the Committees on the Judiciary, International Relations, Armed Services, and Ways and Means of the House of Representatives, and the Select Committee on Intelligence, and the Committees on the Judiciary, Foreign Relations, Armed Services, and Finance of the Senate.

(B) The President may apply sanctions authorized under this chapter to the significant foreign narcotics trafficker identified in the report submitted under subparagraph (A) as if the trafficker were originally included in the report submitted pursuant to subsection (b) of this section.

(C) The President shall notify the Secretary of the Treasury of any determination made under this paragraph.

**(2) Revocation of determination**

(A) Whenever the President finds that a foreign person that has been publicly identified as a significant foreign narcotics trafficker in the report required under subsection (b) of this section or this subsection no longer engages in those activities for which sanctions under this chapter may be applied, the President shall issue public notice of such a finding.

(B) Not later than the date of the public notice issued pursuant to subparagraph (A), the President shall notify, in writing and in classified or unclassified form, the Permanent Select Committee on Intelligence, and the Committees on the Judiciary, International Relations, Armed Services, and Ways and Means of the House of Representatives, and the Select Committee on Intelligence, and the Committees on the Judiciary, Foreign Relations, Armed Services, and Finance of the Senate of actions taken under this paragraph and a description of the basis for such actions.

(Pub. L. 106–120, title VIII, §804, Dec. 3, 1999, 113 Stat. 1626.)

References in Text

The National Security Act of 1947, referred to in subsec. (d)(3), is act July 26, 1947, ch. 343, 61 Stat. 495, as amended. For complete classification of this Act to the Code, see Short Title note set out under section 401 of Title 50, War and National Defense, and Tables.

Change of Name

Committee on International Relations of House of Representatives changed to Committee on Foreign Af- fairs of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007.

Reference to the Director of Central Intelligence or the Director of the Central Intelligence Agency in the Director's capacity as the head of the intelligence community deemed to be a reference to the Director of National Intelligence. Reference to the Director of Central Intelligence or the Director of the Central Intelligence Agency in the Director's capacity as the head of the Central Intelligence Agency deemed to be a reference to the Director of the Central Intelligence Agency. See section 1081(a), (b) of Pub. L. 108–458, set out as a note under section 401 of Title 50, War and National Defense.

Delegation of Functions

For delegation of Congressional reporting functions of President under subsec. (d) of this section, see section 1 of Ex. Ord. No. 13313, July 31, 2003, 68 F.R. 46075, set out as a note under section 301 of Title 3, The President.

**§ 1904. Blocking assets and prohibiting transactions**

**(a) Applicability of sanctions**

A significant foreign narcotics trafficker publicly identified in the report required under subsection (b) or (h)(1) of section 1903 of this title and foreign persons designated by the Secretary of the Treasury pursuant to subsection (b) of this section shall be subject to any and all sanctions as authorized by this chapter. The application of sanctions on any foreign person pursuant to subsection (b) or (h)(1) of section 1903 of this title or subsection (b) of this section shall remain in effect until revoked pursuant to section 1903(h)(2) of this title or subsection (e)(1)(A) of this section or waived pursuant to section 1903(g)(1) of this title.

**(b) Blocking of assets**

Except to the extent provided in regulations, orders, instructions, licenses, or directives issued pursuant to this chapter, and notwithstanding any contract entered into or any license or permit granted prior to the date on which the President submits the report required under subsection (b) or (h)(1) of section 1903 of this title, there are blocked as of such date, and any date thereafter, all such property and interests in property within the United States, or within the possession or control of any United States person, which are owned or controlled by—

(1) any significant foreign narcotics trafficker publicly identified by the President in the report required under subsection (b) or (h)(1) of section 1903 of this title;

(2) any foreign person that the Secretary of the Treasury, in consultation with the Attorney General, the Director of Central Intelligence, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, and the Secretary of State, designates as materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker so identified in the report required under subsection (b) or (h)(1) of section 1903 of this title, or foreign persons designated by the Secretary of the Treasury pursuant to this subsection;

(3) any foreign person that the Secretary of the Treasury, in consultation with the Attorney General, the Director of Central Intelligence, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, and the Secretary of State, designates as owned, controlled, or directed by, or acting for or on behalf of, a significant foreign narcotics trafficker so identified in the report required under subsection (b) or (h)(1) of section 1903 of this title, or foreign persons designated by the Secretary of the Treasury pursuant to this subsection; and

(4) any foreign person that the Secretary of the Treasury, in consultation with the Attorney General, the Director of Central Intelligence, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, and the Secretary of State, designates as playing a significant role in international narcotics trafficking.

**(c) Prohibited transactions**

Except to the extent provided in regulations, orders, instructions, licenses, or directives issued pursuant to this chapter, and notwithstanding any contract entered into or any license or permit granted prior to the date on which the President submits the report required under subsection (b) or (h)(1) of section 1903 of this title, the following transactions are prohibited:

(1) Any transaction or dealing by a United States person, or within the United States, in property or interests in property of any significant foreign narcotics trafficker so identified in the report required pursuant to subsection (b) or (h)(1) of section 1903 of this title, and foreign persons designated by the Secretary of the Treasury pursuant to subsection (b) of this section.

(2) Any transaction or dealing by a United States person, or within the United States, that evades or avoids, or has the effect of evading or avoiding, and any endeavor, attempt, or conspiracy to violate, any of the prohibitions contained in this chapter.

**(d) Law enforcement and intelligence activities not affected**

Nothing in this chapter prohibits or otherwise limits the authorized law enforcement or intelligence activities of the United States, or the law enforcement activities of any State or subdivision thereof.

**(e) Implementation**

(1) The Secretary of the Treasury, in consultation with the Attorney General, the Director of Central Intelligence, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, and the Secretary of State, is authorized to take such actions as may be necessary to carry out this chapter, including—

(A) making those designations authorized by paragraphs (2), (3), and (4) of subsection (b) of this section and revocation thereof;

(B) promulgating rules and regulations permitted under this chapter; and

(C) employing all powers conferred on the Secretary of the Treasury under this chapter.

(2) Each agency of the United States shall take all appropriate measures within its authority to carry out the provisions of this chapter.

(3) Section 552(a)(3) of title 5 shall not apply to any record or information obtained or created in the implementation of this chapter.

(Pub. L. 106–120, title VIII, §805, Dec. 3, 1999, 113 Stat. 1629; Pub. L. 107–108, title III, §307, Dec. 28, 2001, 115 Stat. 1399.)

AMENDMENTS

2001—Subsec. (f). Pub. L. 107–108 struck out heading and text of subsec. (f). Text read as follows: ''The determinations, identifications, findings, and designations made pursuant to section 1903 of this title and subsection (b) of this section shall not be subject to judicial review.''

CHANGE OF NAME

Reference to the Director of Central Intelligence or the Director of the Central Intelligence Agency in the Director's capacity as the head of the intelligence community deemed to be a reference to the Director of National Intelligence. Reference to the Director of Central Intelligence or the Director of the Central Intelligence Agency in the Director's capacity as the head of the Central Intelligence Agency deemed to be a reference to the Director of the Central Intelligence Agency. See section 1081(a), (b) of Pub. L. 108–458, set out as a note under section 401 of Title 50, War and National Defense.

**§ 1905. Authorities**

**(a) In general**

To carry out the purposes of this chapter, the Secretary of the Treasury may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(1) investigate, regulate, or prohibit—

(A) any transactions in foreign exchange, currency, or securities; and

(B) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interests of any foreign country or a national thereof; and

(2) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent, or prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, placement into foreign or domestic commerce of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

by any person, or with respect to any property, subject to the jurisdiction of the United States.

**(b) Recordkeeping**

Pursuant to subsection (a) of this section, the Secretary of the Treasury may require recordkeeping, reporting, and production of documents to carry out the purposes of this chapter.

**(c) Defenses**

(1) Full and actual compliance with any regulation, order, license, instruction, or direction issued under this chapter shall be a defense in

any proceeding alleging a violation of any of the provisions of this chapter.

(2) No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to, and in reliance on this chapter, or any regulation, instruction, or direction issued under this chapter.

**(d) Rulemaking**

The Secretary of the Treasury may issue such other regulations or orders, including regulations prescribing recordkeeping, reporting, and production of documents, definitions, licenses, instructions, or directions, as may be necessary for the exercise of the authorities granted by this chapter.

(Pub. L. 106–120, title VIII, § 806, Dec. 3, 1999, 113 Stat. 1631.)

**§ 1906. Enforcement**

**(a) Criminal penalties**

(1) Whoever willfully violates the provisions of this chapter, or any license rule, or regulation issued pursuant to this chapter, or willfully neglects or refuses to comply with any order of the President issued under this chapter shall be—

(A) imprisoned for not more than 10 years,

(B) fined in the amount provided in title 18 or, in the case of an entity, fined not more than $10,000,000,

or both.

(2) Any officer, director, or agent of any entity who knowingly participates in a violation of the provisions of this chapter shall be imprisoned for not more than 30 years, fined not more than $5,000,000, or both.

**(b) Civil penalties**

A civil penalty not to exceed $1,000,000 may be imposed by the Secretary of the Treasury on any person who violates any license, order, rule, or regulation issued in compliance with the provisions of this chapter.

**(c) Judicial review of civil penalty**

Any penalty imposed under subsection (b) of this section shall be subject to judicial review only to the extent provided in section 702 of title 5.

(Pub. L. 106–120, title VIII, § 807, Dec. 3, 1999, 113 Stat. 1631.)

**§ 1907. Definitions**

As used in this chapter:

**(1) Entity**

The term "entity" means a partnership, joint venture, association, corporation, organization, network, group, or subgroup, or any form of business collaboration.

**(2) Foreign person**

The term "foreign person" means any citizen or national of a foreign state or any entity not organized under the laws of the United States, but does not include a foreign state.

**(3) Narcotics trafficking**

The term "narcotics trafficking" means any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so.

**(4) Narcotic drug; controlled substance; listed chemical**

The terms "narcotic drug", "controlled substance", and "listed chemical" have the meanings given those terms in section 802 of this title.

**(5) Person**

The term "person" means an individual or entity.

**(6) United States person**

The term "United States person" means any United States citizen or national, permanent resident alien, an entity organized under the laws of the United States (including its foreign branches), or any person within the United States.

**(7) Significant foreign narcotics trafficker**

The term "significant foreign narcotics trafficker" means any foreign person that plays a significant role in international narcotics trafficking, that the President has determined to be appropriate for sanctions pursuant to this chapter, and that the President has publicly identified in the report required under subsection (b) or (h)(1) of section 1903 of this title.

(Pub. L. 106–120, title VIII, § 808, Dec. 3, 1999, 113 Stat. 1632.)

**§ 1908. Judicial Review Commission on Foreign Asset Control**

**(a) Establishment**

There is established a commission to be known as the "Judicial Review Commission on Foreign Asset Control" (in this section referred to as the "Commission").

**(b) Membership and procedural matters**

(1) The Commission shall be composed of five members, as follows:

(A) One member shall be appointed by the Chairman of the Select Committee on Intelligence of the Senate.

(B) One member shall be appointed by the Vice Chairman of the Select Committee on Intelligence of the Senate.

(C) One member shall be appointed by the Chairman of the Permanent Select Committee on Intelligence of the House of Representatives.

(D) One member shall be appointed by the Ranking Minority Member of the Permanent Select Committee on Intelligence of the House of Representatives.

(E) One member shall be appointed jointly by the members appointed under subparagraphs (A) through (D).

(2) Each member of the Commission shall, for purposes of the activities of the Commission under this section, possess or obtain an appropriate security clearance in accordance with applicable laws and regulations regarding the handling of classified information.

(3) The members of the Commission shall choose the chairman of the Commission from among the members of the Commission.

(4) The members of the Commission shall establish rules governing the procedures and proceedings of the Commission.

**(c) Duties**

The Commission shall have as its duties the following:

(1) To conduct a review of the current judicial, regulatory, and administrative authorities relating to the blocking of assets of foreign persons by the United States Government.

(2) To conduct a detailed examination and evaluation of the remedies available to United States persons affected by the blocking of assets of foreign persons by the United States Government.

**(d) Powers**

(1) The Commission may hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence as the Commission considers advisable to carry out the purposes of this section.

(2) The Commission may secure directly from any executive department, agency, bureau, board, commission, office, independent establishment, or instrumentality of the Government information, suggestions, estimates, and statistics for the purposes of this section. Each such department, agency, bureau, board, commission, office, establishment, or instrumentality shall, to the extent authorized by law, furnish such information, suggestions, estimates, and statistics directly to the Commission, upon request of the chairman of the Commission. The Commission shall handle and protect all classified information provided to it under this section in accordance with applicable statutes and regulations.

(3) The Attorney General and the Secretary of the Treasury shall provide to the Commission, on a nonreimbursable basis, such administrative services, funds, facilities, and other support services as are necessary for the performance of the Commission's duties under this section.

(4) The Commission shall receive the full and timely cooperation of any official, department, or agency of the United States Government whose assistance is necessary for the fulfillment of the duties of the Commission under this section, including the provision of full and current briefings and analyses.

(5) No department or agency of the Government may withhold information from the Commission on the grounds that providing the information to the Commission would constitute the unauthorized disclosure of classified information or information relating to intelligence sources or methods.

(6) The Commission may use the United States mails in the same manner and under the same conditions as the departments and agencies of the United States.

**(e) Staff**

(1) Subject to paragraph (2), the chairman of the Commission, in accordance with rules agreed upon by the Commission, shall appoint and fix the compensation of a staff director and such other personnel as may be necessary to enable the Commission to carry out its duties, without regard to the provisions of title 5 governing appointments in the competitive service, and without regard to the provisions of chapter 51 and subchapter III or [1] chapter 53 of such title relating to classification and General Schedule pay rates, except that no rate of pay fixed under this subsection may exceed the equivalent of that payable to a person occupying a position at level V of the Executive Schedule under section 5316 of such title.

(2)(A) Any employee of a department or agency referred to in subparagraph (B) may be detailed to the Commission without reimbursement from the Commission, and such detailee shall retain the rights, status, and privileges of his or her regular employment without interruption.

(B) The departments and agencies referred to in this subparagraph are as follows:

(i) The Department of Justice.

(ii) The Department of the Treasury.

(iii) The Central Intelligence Agency.

(3) All staff of the Commission shall possess a security clearance in accordance with applicable laws and regulations concerning the handling of classified information.

**(f) Compensation and travel expenses**

(1)(A) Except as provided in subparagraph (B), each member of the Commission may be compensated at not to exceed the daily equivalent of the annual rate of basic pay in effect for a position at level IV of the Executive Schedule under section 5315 of title 5 for each day during which that member is engaged in the actual performance of the duties of the Commission under this section.

(B) Members of the Commission who are officers or employees of the United States shall receive no additional pay by reason of their service on the Commission.

(2) While away from their homes or regular places of business in the performance of services for the Commission, members of the Commission may be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in the Government service are allowed expenses under section 5703(b) [2] of title 5.

**(g) Report**

(1) Not later than 1 year after December 3, 1999, the Commission[3] shall submit to the committees of Congress referred to in paragraph (4) a report on the activities of the Commission under this section, including the findings, conclusions, and recommendations, if any, of the Commission as a result of the review under subsection (c)(1) of this section and the examination and evaluation under subsection (c)(2) of this section.

(2) The report under paragraph (1) shall include any additional or dissenting views of a member of the Commission upon the request of the member.

---

[1] So in original. Probably should be "of".

[2] So in original. Section 5703 of title 5 does not contain a subsec. (b).

[3] So in original. Probably should be "Commission".

(3) The report under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

(4) The committees of Congress referred to in this paragraph are the following:

(A) The Select Committee on Intelligence and the Committees on Foreign Relations and the Judiciary of the Senate.

(B) The Permanent Select Committee on Intelligence and the Committees on International Relations and the Judiciary of the House of Representatives.

**(h) Termination**

The Commission shall terminate at the end of the 60-day period beginning on the date on which the report required by subsection (g) of this section is submitted to the committees of Congress referred to in that subsection.

**(i) Inapplicability of certain administrative provisions**

(1) The provisions of the Federal Advisory Committee Act (5 U.S.C. App.) shall not apply to the activities of the Commission under this section.

(2) The provisions of section 552 of title 5 (commonly referred to as the Freedom of Information Act) shall not apply to the activities, records, and proceedings of the Commission under this chapter.

**(j) Funding**

The Attorney General shall, from amounts authorized to be appropriated to the Attorney General by this Act, make available to the Commission $1,000,000 for purposes of the activities of the Commission under this section. Amounts made available to the Commission under the preceding sentence shall remain available until expended.

(Pub. L. 106–120, title VIII, § 810, Dec. 3, 1999, 113 Stat. 1633.)

REFERENCES IN TEXT

The Federal Advisory Committee Act, referred to in subsec. (i), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770, which is set out in the Appendix to Title 5, Government Organization and Employees.

This Act, referred to in subsec. (j), is Pub. L. 106–120, Dec. 3, 1999, 113 Stat. 1606, known as the Intelligence Authorization Act for Fiscal Year 2000. For complete classification of this Act to the Code, see Tables.

CHANGE OF NAME

Committee on International Relations of House of Representatives changed to Committee on Foreign Affairs of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007.

**CHAPTER 25—MISCELLANEOUS ANTI-DRUG ABUSE PROVISIONS**

SUBCHAPTER I—ANTI-DOPING AGENCY

Sec.
2001.   Designation of United States Anti-Doping Agency.
2002.   Records, audit, and report.
2003.   Authorization of appropriations.

SUBCHAPTER II—NATIONAL METHAMPHETAMINE INFORMATION CLEARINGHOUSE

2011.   Definitions.
2012.   Establishment of clearinghouse and advisory council.
2013.   NMIC requirements and review.
2014.   Authorization of appropriations.

SUBCHAPTER I—ANTI-DOPING AGENCY

**§ 2001. Designation of United States Anti-Doping Agency**

**(a) Definitions**

In this subchapter:

**(1) United States Olympic Committee**

The term ''United States Olympic Committee'' means the organization established by the ''Ted Stevens Olympic and Amateur Sports Act'' (36 U.S.C. 220501 et seq.).

**(2) Amateur athletic competition**

The term ''amateur athletic competition'' means a contest, game, meet, match, tournament, regatta, or other event in which amateur athletes compete (36 U.S.C. 220501(b)(2)).

**(3) Amateur athlete**

The term ''amateur athlete'' means an athlete who meets the eligibility standards established by the national governing body or paralympic sports organization for the sport in which the athlete competes (36 U.S.C. 22501(b)(1)).[1]

**(4) Gene doping**

The term ''gene doping'' means the non-therapeutic use of cells, genes, genetic elements, or of the modulation of gene expression, having the capacity to enhance athletic performance.

**(b) In general**

The United States Anti-Doping Agency shall—

(1) serve as the independent anti-doping organization for the amateur athletic competitions recognized by the United States Olympic Committee;

(2) ensure that athletes participating in amateur athletic activities recognized by the United States Olympic Committee are prevented from using performance-enhancing drugs, or performance-enhancing genetic modifications accomplished through gene-doping;

(3) implement anti-doping education, research, testing, and adjudication programs to prevent United States Amateur Athletes participating in any activity recognized by the United States Olympic Committee from using performance-enhancing drugs, or performance-enhancing genetic modifications accomplished through gene-doping;

(4) serve as the United States representative responsible for coordination with other anti-doping organizations coordinating amateur athletic competitions recognized by the United States Olympic Committee to ensure the integrity of athletic competition, the health of the athletes and the prevention of use of performance-enhancing drugs, or performance-enhancing genetic modifications accomplished through gene-doping by United States amateur athletes; and

(5) permanently include ''gene doping'' among any list of prohibited substances adopted by the Agency.

_____
[1] So in original. Probably should be ''220501(b)(1)).''

expenses in the same manner as the payment of final judgments as provided in this Act [probably should be "this title", see Short Title note above] would be effective only to the extent and in such amounts as are provided in advance in appropriation Acts, was repealed by Pub. L. 99–80, § 4, Aug. 5, 1985, 99 Stat. 186.

## SUBCHAPTER II—ADMINISTRATIVE PROCEDURE

### Short Title

The provisions of this subchapter and chapter 7 of this title were originally enacted by act June 11, 1946, ch. 324, 60 Stat. 237, popularly known as the "Administrative Procedure Act". That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into this subchapter and chapter 7 hereof.

## § 551. Definitions

For the purpose of this subchapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

or except as to the requirements of section 552 of this title—

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;

(2) "person" includes an individual, partnership, corporation, association, or public or private organization other than an agency;

(3) "party" includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) "adjudication" means agency process for the formulation of an order;

(8) "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

(9) "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

(10) "sanction" includes the whole or a part of an agency—

(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;

(B) withholding of relief;

(C) imposition of penalty or fine;

(D) destruction, taking, seizure, or withholding of property;

(E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;

(F) requirement, revocation, or suspension of a license; or

(G) taking other compulsory or restrictive action;

(11) "relief" includes the whole or a part of an agency—

(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

(B) recognition of a claim, right, immunity, privilege, exemption, or exception; or

(C) taking of other action on the application or petition of, and beneficial to, a person;

(12) "agency proceeding" means an agency process as defined by paragraphs (5), (7), and (9) of this section;

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

(14) "ex parte communication" means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 381; Pub. L. 94–409, § 4(b), Sept. 13, 1976, 90 Stat. 1247; Pub. L. 103–272, § 5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, § 5(a)(2), Jan. 4, 2011, 124 Stat. 3841.)

### Historical and Revision Notes

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (1) ............ | 5 U.S.C. 1001(a). | June 11, 1946, ch. 324, § 2(a), 60 Stat. 237. |
| | | Aug. 8, 1946, ch. 870, § 302, 60 Stat. 918. |
| | | Aug. 10, 1946, ch. 951, § 601, 60 Stat. 993. |
| | | Mar. 31, 1947, ch. 30, § 6(a), 61 Stat. 37. |
| | | June 30, 1947, ch. 163, § 210, 61 Stat. 201. |

HISTORICAL AND REVISION NOTES—CONTINUED

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (2)–(13) ........ | 5 U.S.C. 1001 (less (a)). | Mar. 30, 1948, ch. 161, § 301, 62 Stat. 99.<br>June 11, 1946, ch. 324, § 2 (less (a)), 60 Stat. 237. |

In paragraph (1), the sentence "Nothing in this Act shall be construed to repeal delegations of authority as provided by law," is omitted as surplusage since there is nothing in the Act which could reasonably be so construed.

In paragraph (1)(G), the words "or naval" are omitted as included in "military".

In paragraph (1)(H), the words "functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947" are omitted as executed. Reference to the "Selective Training and Service Act of 1940" is omitted as that Act expired Mar. 31, 1947. Reference to the "Sugar Control Extension Act of 1947" is omitted as that Act expired on Mar. 31, 1948. References to the "Housing and Rent Act of 1947, as amended" and the "Veterans' Emergency Housing Act of 1946" have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by § 111(a)(1) of the Act of Sept. 21, 1961, Pub. L. 87–256, 75 Stat. 538, since § 111(c) of the Act provides that a reference in other Acts to a provision of law repealed by § 111(a) shall be considered to be a reference to the appropriate provisions of Pub. L. 87–256.

In paragraph (2), the words "of any character" are omitted as surplusage.

In paragraph (3), the words "and a person or agency admitted by an agency as a party for limited purposes" are substituted for "but nothing herein shall be construed to prevent an agency from admitting any person or agency as a party for limited purposes".

In paragraph (9), a comma is supplied between the words "limitation" and "amendment" to correct an editorial error of omission.

In paragraph (10)(C), the words "of any form" are omitted as surplusage.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

CODIFICATION

Section 551 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2242 of Title 7, Agriculture.

AMENDMENTS

2011—Par. (1)(H). Pub. L. 111–350 struck out "chapter 2 of title 41;" after "title 12;".

1994—Par. (1)(H). Pub. L. 103–272 substituted "subchapter II of chapter 471 of title 49; or sections" for "or sections 1622,".

1976—Par. (14). Pub. L. 94–409 added par. (14).

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–409 effective 180 days after Sept. 13, 1976, see section 6 of Pub. L. 94–409, set out as an Effective Date note under section 552b of this title.

STUDY AND REPORTS ON ADMINISTRATIVE SUBPOENAS

Pub. L. 106–544, § 7, Dec. 19, 2000, 114 Stat. 2719, provided that:

"(a) STUDY ON USE OF ADMINISTRATIVE SUBPOENAS.— Not later than December 31, 2001, the Attorney General, in consultation with the Secretary of the Treasury, shall complete a study on the use of administrative subpoena power by executive branch agencies or entities and shall report the findings to the Committees on the Judiciary of the Senate and the House of Representatives. Such report shall include—

"(1) a description of the sources of administrative subpoena power and the scope of such subpoena power within executive branch agencies;

"(2) a description of applicable subpoena enforcement mechanisms;

"(3) a description of any notification provisions and any other provisions relating to safeguarding privacy interests;

"(4) a description of the standards governing the issuance of administrative subpoenas; and

"(5) recommendations from the Attorney General regarding necessary steps to ensure that administrative subpoena power is used and enforced consistently and fairly by executive branch agencies.

"(b) REPORT ON FREQUENCY OF USE OF ADMINISTRATIVE SUBPOENAS.—

"(1) IN GENERAL.—The Attorney General and the Secretary of the Treasury shall report in January of each year to the Committees on the Judiciary of the Senate and the House of Representatives on the number of administrative subpoenas issued by them under this section and the identity of the agency or component of the Department of Justice or the Department of the Treasury issuing the subpoena and imposing the charges.

"(2) EXPIRATION.—The reporting requirement of this subsection shall terminate in 3 years after the date of the enactment of this section [Dec. 19, 2000]."

§ 552. Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, §10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

§ 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

§ 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

§ 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
| --- | --- | --- |
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding sections 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a

§ 501.807                                          31 CFR Ch. V (7–1–11 Edition)

(5) The intended beneficiary of the blocked transfer;

(6) A description of the underlying transaction including copies of related documents (e.g., invoices, bills of lading, promissory notes, etc.);

(7) The nature of the applicant's interest in the funds; and

(8) A statement of the reasons why the applicant believes the funds were blocked due to mistaken identity.

(e) Upon receipt of the materials required by paragraph (d) of this section, OFAC may request additional material from the applicant concerning the transaction pursuant to § 501.602.

(f) Following review of all applicable submissions, the Director of the Office of Foreign Assets Control will determine whether to release the funds. In the event the Director determines that the funds should be released, the Office of Foreign Assets Control will direct the financial institution to return the funds to the appropriate party.

(g) For purposes of this section, the term "financial institution" shall include a banking institution, depository institution or United States depository institution, domestic bank, financial institution or U.S. financial institution, as those terms are defined in the applicable part of this chapter.

[62 FR 45101, Aug. 25, 1997, as amended at 62 FR 52495, Oct. 8, 1997]

§ 501.807  Procedures governing delisting from the Specially Designated Nationals and Blocked Persons List.

A person may seek administrative reconsideration of his, her or its designation or that of a vessel as blocked, or assert that the circumstances resulting in the designation no longer apply, and thus seek to have the designation rescinded pursuant to the following administrative procedures:

(a) A person blocked under the provisions of any part of this chapter, including a specially designated national, specially designated terrorist, or specially designated narcotics trafficker (collectively, "a blocked person"), or a person owning a majority interest in a blocked vessel may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation.

The blocked person also may propose remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for designation. A person owning a majority interest in a blocked vessel may propose the sale of the vessel, with the proceeds to be placed into a blocked interest-bearing account after deducting the costs incurred while the vessel was blocked and the costs of the sale. This submission must be made in writing and addressed to the Director, Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, NW.—Annex, Washington, DC 20220.

(b) The information submitted by the blocked person seeking unblocking or by a person seeking the unblocking of a vessel will be reviewed by the Office of Foreign Assets Control, which may request clarifying, corroborating, or other additional information.

(c) A blocked person seeking unblocking or a person seeking the unblocking of a vessel may request a meeting with the Office of Foreign Assets Control; however, such meetings are not required, and the office may, at its discretion, decline to conduct such meetings prior to completing a review pursuant to this section.

(d) After the Office of Foreign Assets Control has conducted a review of the request for reconsideration, it will provide a written decision to the blocked person or person seeking the unblocking of a vessel.

[64 FR 5614, Feb. 4, 1999]

§ 501.808  License application and other procedures applicable to economic sanctions programs.

Upon submission to the Office of Management and Budget of an amendment to the overall burden hours for the information collections imposed under this part, the license application and other procedures set forth in this subpart are applicable to economic sanctions programs for which implementation and administration have been delegated to the Office of Foreign Assets Control.

**Office of Foreign Assets Control, Treasury**                                   **§ 598.203**

### Subpart G—Penalties

598.701  Penalties.
598.702  Prepenalty notice.
598.703  Response to prepenalty notice; informal settlement.
598.704  Penalty imposition or withdrawal.
598.705  Administrative collection; referral to United States Department of Justice.
598.706  Judicial review of civil penalty.

### Subpart H—Procedures

598.801  Procedures.
598.802  Availability of information pursuant to the Freedom of Information Act.
598.803  Delegation by the Secretary of the Treasury.

### Subpart I—Paperwork Reduction Act

598.901  Paperwork Reduction Act notice.

AUTHORITY: 3 U.S.C. 301; 21 U.S.C. 1901–1908; 31 U.S.C. 321(b); Pub. L. 101–410, 104 Stat. 890 (28 U.S.C. 2461 note).

SOURCE: 65 FR 41336, July 5, 2000, unless otherwise noted.

## Subpart A—Relation of This Part to Other Laws and Regulations

### § 598.101  Relation of this part to other laws and regulations.

(a) This part is separate from, and independent of, the other parts of this chapter, including part 536 of this chapter, "Narcotics Trafficking Sanctions Regulations," with the exception of part 501 of this chapter, the provisions of which apply to this part. Actions taken pursuant to part 501 of this chapter with respect to the prohibitions contained in this part are considered actions taken pursuant to this part. Differing foreign policy and national security contexts may result in differing interpretations of similar language among the parts of this chapter. No license or authorization contained in or issued pursuant to those other parts authorizes any transaction prohibited by this part. No license or authorization contained in or issued pursuant to any other provision of law or regulation authorizes any transaction prohibited by this part.

(b) No license contained in or issued pursuant to this part relieves the involved parties from complying with any other applicable laws or regulations.

## Subpart B—Prohibitions

### § 598.201  Applicability of sanctions.

A specially designated narcotics trafficker is subject to any and all sanctions authorized by the Foreign Narcotics Kingpin Designation Act and implemented in this part. The application of sanctions on any specially designated narcotics trafficker will remain in effect until revoked by the President pursuant to section 804(h)(2) of the Foreign Narcotics Kingpin Designation Act, waived by the President pursuant to section 804(g)(1) of that Act, or revoked by the Secretary of the Treasury pursuant to section 805(e)(1)(A) of that Act.

### § 598.202  Blocking of assets.

Except to the extent provided in regulations, orders, instructions, licenses, or directives issued pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, there are blocked as of the effective date, and any date thereafter, all such property and interests in property within the United States, or within the possession or control of any United States person, which are owned or controlled by a specially designated narcotics trafficker.

### § 598.203  Prohibited transactions involving blocked property.

(a) Except to the extent provided in regulations, orders, instructions, licenses, or directives issued pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, any transaction or dealing by a United States person, or within the United States, in property or interests in property of a specially designated narcotics trafficker is prohibited.

(b) Unless otherwise authorized by this part or by a specific license expressly referring to this section, any dealing in any security (or evidence thereof) held within the possession or control of a U.S. person and either registered or inscribed in the name of or known to be held for the benefit of any specially designated narcotics trafficker is prohibited. This prohibition includes but is not limited to the

533

transfer (including the transfer on the books of any issuer or agent thereof), disposition, transportation, importation, exportation, or withdrawal of any such security or the endorsement or guaranty of signatures on any such security.

(c) When a transaction results in the blocking of funds at a financial institution pursuant to this section and a party to the transaction believes the funds have been blocked due to mistaken identity, that party may seek to have such funds unblocked pursuant to the administrative procedures set forth in § 501.806 of this chapter.

§ 598.204  Evasions; attempts; conspiracies.

Except to the extent provided in regulations, orders, instructions, licenses, or directives issued pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, any transaction or dealing by any United States person, or within the United States, that evades or avoids, or has the effect of evading or avoiding, and any endeavor, attempt, or conspiracy to violate any of the prohibitions set forth in this part is prohibited.

§ 598.205  Effect of transfers violating the provisions of this part.

(a) Any transfer after the effective date that is in violation of any provision of this part or of any regulation, order, directive, ruling, instruction, or license issued pursuant to this part, and that involves any property or interest in property of a specially designated narcotics trafficker is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege with respect to such property or property interests.

(b) No transfer before the effective date shall be the basis for the assertion or recognition of any right, remedy, power, or privilege with respect to, or any interest in, any property or interest in property of a specially designated narcotics trafficker, unless the person with whom such property is held or maintained, prior to that date, had written notice of the transfer or by

any written evidence had recognized such transfer.

(c) Unless otherwise provided, an appropriate license or other authorization issued by or pursuant to the direction or authorization of the Director of the Office of Foreign Assets Control before, during, or after a transfer shall validate such transfer or make it enforceable to the same extent that it would be valid or enforceable but for the provisions of the Foreign Narcotics Kingpin Designation Act, this part, and any regulation, order, directive, ruling, instruction, or license issued pursuant to this part.

(d) Property transfers that otherwise would be null and void or unenforceable by virtue of the provisions of this section shall not be deemed to be null and void or unenforceable as to any person with whom such property was held or maintained (and as to such person only) in cases in which such person is able to establish to the satisfaction of the Director of the Office of Foreign Assets Control each of the following:

(1) Such transfer did not represent a willful violation of the provisions of this part by the person with whom such property was held or maintained;

(2) The person with whom such property was held or maintained did not have reasonable cause to know or suspect, in view of all the facts and circumstances known to or available to such person, that such transfer required a license issued pursuant to this part and was not so licensed, or if a license did purport to cover the transfer, that such license had been obtained by misrepresentation of a third party or withholding of material facts or was otherwise fraudulently obtained; and

(3) The person with whom such property was held or maintained filed with the Office of Foreign Assets Control a report setting forth in full the circumstances relating to such transfer promptly upon discovery that:

(i) Such transfer was in violation of the provisions of this part or any regulation, ruling, instruction, direction, or license issued pursuant to this part;

(ii) Such transfer was not licensed or authorized by the Director of the Office of Foreign Assets Control; or

**Office of Foreign Assets Control, Treasury**                    **§ 598.301**

(iii) If a license did purport to cover the transfer, such license had been obtained by misrepresentation of a third party or withholding of material facts or was otherwise fraudulently obtained.

NOTE TO PARAGRAPH (d) OF § 598.205: The filing of a report in accordance with the provisions of paragraph (d)(3) of this section shall not be deemed evidence that the terms of paragraphs (d)(1) and (2) of this section have been satisfied.

(e) Unless licensed or authorized pursuant to this part, any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since the effective date there existed an interest of a specially designated narcotics trafficker.

**§ 598.206  Holding of funds in interest-bearing accounts; investment and reinvestment.**

(a) Except as provided in paragraph (c) or (d) of this section, or as otherwise directed by the Office of Foreign Assets Control, any U.S. person holding funds, such as currency, bank deposits, or liquidated financial obligations, subject to § 598.202 shall hold or place such funds in a blocked interest-bearing account located in the United States.

(b)(1) For purposes of this section, the term *blocked interest-bearing account* means a blocked account:

(i) In a federally-insured U.S. bank, thrift institution, or credit union, provided the funds are earning interest at rates that are commercially reasonable; or

(ii) With a broker or dealer registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934, provided the funds are invested in a money market fund or in U.S. Treasury bills.

(2) For purposes of this section, a rate is commercially reasonable if it is the rate currently offered to other depositors on deposits or instruments of comparable size and maturity.

(3) Funds held or placed in a blocked account pursuant to this paragraph (b) may not be invested in instruments the maturity of which exceeds 180 days. If interest is credited to a separate blocked account or sub-account, the

name of the account party on each account must be the same.

(c) Blocked funds held in instruments the maturity of which exceeds 180 days at the time the funds become subject to § 598.202 may continue to be held until maturity in the original instrument, provided any interest, earnings, or other proceeds derived therefrom are paid into a blocked interest-bearing account in accordance with paragraph (b) or (d) of this section.

(d) Blocked funds held in accounts or instruments outside the United States at the time the funds become subject to § 598.202 may continue to be held in the same type of accounts or instruments, provided the funds earn interest at rates that are commercially reasonable.

(e) This section does not create an affirmative obligation for the holder of blocked tangible property, such as chattels or real estate, or of other blocked property, such as debt or equity securities, to sell or liquidate such property at the time the property becomes subject to § 598.202. However, the Office of Foreign Assets Control may issue licenses permitting or directing such sales in appropriate cases.

(f) Funds subject to this section may not be held, invested, or reinvested in a manner that provides immediate financial or economic benefit or access to specially designated narcotics traffickers, nor may their holder cooperate in or facilitate the pledging or other attempted use as collateral of blocked funds or other assets.

NOTE TO § 598.206: Please refer to § 598.505 for authorized investment and reinvestment of certain funds held in blocked accounts.

## Subpart C—General Definitions

**§ 598.301  Blocked account; blocked property.**

The terms *blocked account* and *blocked property* mean any account or property subject to § 598.202 held in the name of a specially designated narcotics trafficker, or in which a specially designated narcotics trafficker has an interest, and with respect to which payments, transfers, exportations, withdrawals, or other dealings may not be made or effected except pursuant to an